1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9

10

11

12

13

14

15

16

Michael John McLeod, Peter Kamenkovich, Andrew Punzak, Justin Chandler, Michael Alphin, Timothy Woelper, Daniel Kim, Ryan Ford, Jacob Williard, Ryan Klimt, Mitchell Gunter, Jacob Phillips, Dakota Barney, Nicholas Mora, Vincent Cianfaglione, Dylan Latvis, Levi Ledbetter, Daniel Spann, Jake Bohl, Rahul Malhotra, Bradford Daniels, Scott Hallman, Jared Conley, Kevin Ryan, Isaac Lynn, Sam Keller, Dominic Allen, Samuel Joines, Nicholas Crain, Christopher Calvi, J.J., L.O., L.L., K.M., S.S., G.G., G.L., A.D., G.M., P.L., P.S., A.L., N.M., and K.M. individually and on Behalf of All Others Similarly Situated,

17

Plaintiffs,

18

v.

19

20

21

22

23

VALVE CORPORATION, a Washington corporation; CSGOLOTTO INC., a Florida corporation; OPSKINS GROUP, INC., a Canadian corporation; JAMES VARGA, a Nevada individual; PHANTOML0RD INC., a Nevada Corporation; CSGO SHUFFLE, a European Company; TREVOR A. MARTIN, a Florida individual; and THOMAS CASSELL, a California individual,

24

Defendants.

25

26

NO. 16-cv-01227-JCC

**PLAINTIFFS' RESPONSE TO DEFENDANT VALVE CORPORATION'S MOTION TO COMPEL ARBITRATION**

**NOTE ON MOTION CALENDAR: September 23, 2016**

**ORAL ARGUMENT REQUESTED**

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 1

II. FACTUAL BACKGROUND ...................................................................................... 5

III. LEGAL STANDARD ................................................................................................ 10

IV. DISCUSSION ........................................................................................................... 11

    A.    Plaintiffs' Claims Arise From Unauthorized Use of Steam Marketplace That Violated The SSA. ................................................................................ 11

    B.    Valve Cannot Enforce The SSA Against Minor Plaintiffs, Disaffirming Adult Plaintiffs And/Or Parent Plaintiffs. ............................................... 17

        1.  Valve Cannot Enforce Its SSA Against Minor Plaintiffs. ........................... 17

        2.  Valve Cannot Enforce Its SSA Against Disaffirming Minors. .................... 22

        3.  Valve Cannot Enforce Its SSA Against the Parent Plaintiffs. ...................... 23

    C.    The SSA Is Not A Valid, Enforceable Contract Against All Plaintiffs ............. 24

        1.  Valve Has Not Met Its Burden of Showing An  Enforceable Agreement Exists ......................................................................................... 24

        2.  The SSA Is Void for Illegality ..................................................................... 25

        3.  Valve's Arbitration Provision Is Unconscionable. ...................................... 25

        4.  Valve's SSA Is An Illusory Contract Because As Shown AboveValve's Performance Is In Its Sole Discretion. .................................. 28

V. CONCLUSION .......................................................................................................... 30

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - i

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

# TABLE OF AUTHORITIES

**Cases**

*Armendariz v. Found. Health Psychcare Serv.*
  24 Cal. 4th 83, 113 (2000) ........................................................................ 26, 27

*AT&T Mobility LLC v. Concepcion*
  563 U.S. 333, 131 S. Ct. 1740  (2011). .......................................................... 25

*AT&T Techs., Inc. v. Comm'cns Workers of Am.*
  475 U.S. 643 (1986). .................................................................................. 4, 10

*AV v. iParadigms*
  544 F. Supp. 2d 473 (E.D. Va. 2008) ............................................................. 21

*Briones v. Fitness Int'l, LLC*
  No. SACV 16-44-JLS, Slip Op. at 7 (C.D. Cal. Aug. 5, 2016) ............................ 24

*Casey v. Kastel*
  237 N.Y. 305 (1924) ..................................................................................... 18

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*
  207 F.3d 1126 (9th Cir. 2000). ....................................................................... 10

*Coppock v. Citigroup, Inc.*
  2013 U.S. Dist. LEXIS 40632, *14 (W.D. Wash. Mar. 22, 2013) .............. 4, 10, 14

*Dawes v. Facebook, Inc*.
  885 F.Supp.2d 894 (S.D.Ill. 2012). ................................................................ 20

*Del Santo v. Bristol Cty. Stadium, Inc.*
  273 F.2d 605 (1st Cir. 1960) .......................................................................... 19

*Donatelli v. D.R. Strong Consulting Enr'rs, Inc.*
  179 Wn.2d 84 (2013) ..................................................................................... 14

*Ekin v. Amazon Servs., LLC*
  84 F.Supp. 3d 1172 (W.D. Wash. Dec. 10, 2014) ....................................... 13, 29

*Fisher Props. Inc. v. Arden-Mayfair, Inc.*
  106 Wn.2d 826 (1986) ................................................................................... 11

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - i

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

*Golberg v. Sanglier*
  96 Wash. 2d 874 (1982). ................................................................................. 25

*Green Tree Fin. Corp.-Ala.* v. *Rudolph*
  531 U.S. 79 (2000). ........................................................................................ 10

*I.B. ex rel. Fife v. Facebook, Inc.*
  905 F.Supp.2d 989 (N.D.Cal.2012) ........................................................... 19, 20

*Ingle v. Circuit City Stores, Inc.*
  328 F.3d 1165 (9th Cir. 2003) ..................................................................... 17

*James Hardie Bldg. Prods. v. Good, Inc.*
  2013 U.S. Dist. LEXIS 102351 ..................................................................... 10

*JZK, Inc. v. Coverdale*
  192 Wash. App. 1022 (2016) ......................................................................... 25

*Knutson v. Sirius XM Radio, Inc.*
  771 F.3d 559 (9th Cir. 2014) ......................................................................... 24

*Lane v. Wahl*
  101 Wash. App. 878, 6 P.3d 621 (2000). ...................................................... 28

*Lowden v. T-Mobile USA, Inc.*
  512 F.3d 1213 (9th Cir. 2008) ....................................................................... 27

*Lubin v. Cowell*
  25 Wn.2d 171 (1946) ............................................................................... 18, 19

*McKee v. AT & T Corp.*
  164 Wash. 2d 372 (2008). ............................................................................. 25

*Meyer v. Kalanick*
  --- F.Supp.3d ----, 2016 WL 4073012 (S.D.N.Y. July 29, 2016) ...................... 30

*Mohamed v. Uber Techs., Inc.*
  109 F. Supp. 3d 1185 (N.D. Cal. 2015) ......................................................... 27

*Options of Chicago, Inc., v. Kaplan*
  514 U.S. 938 (1995). ..................................................................................... 10

*Ownzones Media Network, Inc., v. Sys. In Motion, LLC*
  2014 U.S. Dist. LEXIS 129643 (W.D. Wash. Sept. 12, 2014) ......................... 13

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - ii

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

*Peers. v. McLaughlin*
26 P. 119 (1891) ................................................................................... 21

*Peters v. Amazon Servs. LLC*
F. Supp. 3d. 1165 (W.D. Wash. Nov. 5, 2013) ................................... 10

*Plummer v. Northern Pac. Ry. Co.*
98 Wash. 67 (1917) ............................................................................. 19

*Rebolledo v. Tilly's, Inc.*
228 Cal. App. 4th 900 (Cal. App. 2014) ............................................ 15

*Richardson's v. Bart's Car Store, Inc.*
2014 U.S. Dist. LEXIS 173208 *18 (S.D. Ind. Dec. 15, 2014) ............ 16

*Sak & Assocs., Inc. v. Ferguson Constr., Inc.*
189 W. App. 405 (Wash. Ct. App. 2015). ..................................... 28, 29

*Sakkab v. Luxottica Retail N. Am.*
803 F.3d 425 (9th Cir. 2015). ............................................................. 26

*Scott v. Cingular Wireless*
160 Wash. 2d 843 (2007) .................................................................... 27

*Sheller v. Frank's Nursery*
957 F.Supp. 150 (1997) ...................................................................... 21

*Sims v. Everhardt*
102 U.S. 300, 26 L. Ed. 87 (1880) ..................................................... 19

*Snodderly v. Brotherton*
173 Wash. 86 (1933). ................................................................... 18, 20

*Townsend v. Quadrant Corp.*
173 Wn.2d 451 (2012) ........................................................................ 23

*Value Auto Credit, Inc. v. Talley*
727 So. 2d 61 (Ala. 1991) .................................................................. 21

*Verinata Health, Inc., v. Ariosa Diagnostics, Inc.*
2016 U.S. App. LEXIS 13557(Fed. Cir. July 26, 2016). .................. 14, 15

*Warrior & Gulf Nav. Co.*
363 U.S. 574 (1960) ............................................................................ 10

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

*Wise v. Truck Ins. Exch.*
   11 Wn. App. 405 (1974) ............................................................................................ 18

*Yoo v. Jho*
   147 Cal. App. 4th 1249 (2007) ................................................................................ 25

*York v. Wahkiakum Sch. Dist. No. 200*
   163 Wn.2d 297 (2008) ............................................................................................. 19

*Zuver v. Airtouch Commc'ns, Inc.*
   153 Wash. 2d 293 (2004) ........................................................................................ 26

**Statutes**
Del. Code Ann. § 4810 ................................................................................................ 22
N.J.A.C. 13:69O-1.3(b)(5) .......................................................................................... 22
RCW 7.04A *et seq* ...................................................................................................... 18
RCW 7.04A.060(1). ..................................................................................................... 18
RCW 9.46.010 ............................................................................................................. 25
RCW 9.46.237 ............................................................................................................. 25
RCW 9.46.240 ............................................................................................................. 25
RCW 26.28.030 ................................................................................................ 17, 18, 19, 22

**Regulations**
NGC Reg. 5A.110(1) .................................................................................................... 22
NGC Reg. 5A.110(2) .................................................................................................... 22

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - iv

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Plaintiffs on behalf of themselves and all others similarly situated, by and through counsel, submit the following Response to Defendant Valve Corporation's ("Valve") Motion to Compel Arbitration ("Valve's Motion").

## I. INTRODUCTION

Valve Corporation's arbitration clause expressly excludes all of Plaintiffs' claims from arbitration and expressly allows Plaintiffs to bring their claims in this Court. *See* Valve's Motion at Exhibit G, Steam Subscriber Agreement ("SSA"), pg. 11 ("However, this Section does not apply to the following types of claims or disputes, which you or Valve may bring in any court with jurisdiction: . . . claims related to or arising from any alleged unauthorized use."). Valve and Plaintiffs each allege that Plaintiffs' claims arise from and are related to three types of separate but interrelated unauthorized use, and therefore all of Plaintiffs' claims are properly before this Court. *See* Valve's Motion at pg. 1.

Every single transaction underlying Plaintiffs' claims takes place on Valve's servers, under Valve's own roof. First Amended Class Action Complaint ("FAC"), Dkt. # 11 at ¶¶ 10, 16, 87, 143, 145, 146. Valve is basically running an old-fashioned corner bar and saloon where there are gambling tables in the backroom. Valve controls the door through the Steam Marketplace user login system. Once users are in, they can buy chips from Valve, called "Skins", can gamble by logging into websites using their Steam login, cash out through websites using their Steam login, and buy real world items with proceeds from sales of those chips on Valve's website, from which Valve takes a fee. *Id.* at ¶¶ 6, 7, 10, 11, 15, 18, 102, 146.

The virtual corner bar here is Valve's Steam Marketplace, a website owned entirely by Valve and hosted entirely on Valve's servers where Skins are bought, sold, and traded between user accounts and accounts owned and managed on other websites. *Id.* at, e.g., ¶¶ 3, 5, 6. Skins

never leave Valve's servers. Any Skins transaction occurs between two Valve accounts, one of which is owned by users, such as the Plaintiffs, and the other by third-party websites like the Skins Gambling websites, including some of the other defendants. *Id.* In order to facilitate these trades, these third-party sites had to create hundreds, thousands, or even hundreds of thousands of Valve accounts on the Steam Marketplace; these third parties and Valve used various technological shortcuts to get around the difficulties of creating, operating, and handling Skins trades through such a high volume of user accounts. *Id.* at ¶¶ 10, 11, 120, 198, 199.

Those technical shortcuts violate the SSA, and are the first type of unauthorized use related to and giving rise to Plaintiffs' claims. The evidence that Plaintiffs' claims are related to and arise from "alleged unauthorized use" is overwhelming and, indeed, is made directly by Valve on the very first page of its very first substantive pleading in this case:

> **Plaintiffs claim they lost money gambling on unrelated third-party websites** that have sprung up to capitalize on CS:GO's global success. Those sites allow Steam subscribers to wager on the outcome of CS:GO matches or games of chance using virtual, cosmetic items from CS:GO called "skins," which have no real money value within Steam and cannot be sold or redeemed through Valve for real-world money. **The sites facilitate gambling by misusing Steam accounts and exploiting Steam's trading feature, in violation of the SSA**.

Valve's Motion at pg. 1 (emphasis added).

Valve's allegation that Plaintiffs' claims arise from unauthorized use comports with what Valve has told the public and with Plaintiffs' Complaint. On July 13, 2016, Valve began the process of shutting down Skins Gambling by issuing a statement on its website. *See* http://store.steampowered.com/news/22883/, cited in the FAC at ¶¶186-192. In this statement, Valve told users that Skins Gambling websites "create automated Steam accounts that make the same web calls as individual Steam users." FAC at ¶188. Valve went on to allege that "making

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 2

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1   the same web calls as Steam users to run a gambling business is not allowed by our API nor our

2   user agreements." *Id*. at ¶189.  Valve specifically prohibits bots and automated software and

3   defines use of that software as "unauthorized" in Section 4 of the SSA: "You may not use Cheats,

4   automation software (bots), mods, hacks, or any other unauthorized third-party software, to

5   modify or automate any Subscription Marketplace process." *Id.* at ¶198 (*citing* SSA at Section

6   4, found at Valve's Motion, Ex. G, pg. 7).  Valve has thus alleged unauthorized use of Steam by

7   gambling websites for the actions giving rise to Plaintiffs' claims.  FAC at ¶190.

8

9        After making this statement, Valve sent Cease and Desist letters to at least 23 different

10   gambling websites. *Id.* at ¶197.  In this letter, Valve alleged that it was aware that the 23 websites

11   were "operating one of the gambling sites . . . [and] using Steam accounts to conduct this

12   business." *Id.*  Further, Valve alleged that these gambling websites' "commercial use of Steam

13   accounts is unlicensed and in violation of the SSA," and that they "should immediately cease and

14   desist further use of [their] Steam accounts for any commercial purpose." *Id.*

15

16        Both maintaining illegal gambling websites and using their Valve accounts for

17   commercial purposes is unauthorized under the SSA.  Specifically, SSA Section 4 allows Valve

18   to terminate accounts for engaging in "any conduct or activity that Valve believes is illegal." *See*

19   Valve's Motion Ex. G, pg. 7.  Valve's SSA only grants a license for "non-commercial use (except

20   where commercial use is expressly allowed herein or in the applicable Subscription Terms.)" *Id.*

21   at Section 2A, pg. 3.  Commercial use is further unauthorized under SSA Section 2G ("You may

22   not use the Content and Services for any purpose other than the permitted access to Steam and

23   your Subscriptions, and to make personal, non-commercial use of your Subscriptions…") and

24   Section 2G(iii) ("you are not entitled to…(iii) exploit the Content and Services or any of its parts

25   for any commercial purpose…"). *Id.* at pg. 4.

26

---

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 3

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

It can be said with "positive assurance" that Sections 2, 4, and 11 of Valve's SSA expressly exempt Plaintiffs' claims from its arbitration clause.  *See Coppock v. Citigroup, Inc.*, 2013 U.S. Dist. LEXIS 40632, *14 (W.D. Wash. Mar. 22, 2013) (Coughenour, J.) (citations omitted).  This Court must deny Valve's Motion because "the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *Coppock*, 2013 U.S. Dist. LEXIS 40632, at *14 (quoting *AT&T Techs., Inc. v. Comm'cns Workers of Am.*, 475 U.S. 643, 650 (1986).

Not only do all of Plaintiffs' claims arise from what Valve alleges is "unauthorized use," but none of these Plaintiffs are subject to arbitration for separate but related reasons.  Seventeen (17) parents on behalf of themselves ("Parent Plaintiffs") and their minor children ("Minor Plaintiffs"), fifteen (15) Plaintiffs who were under age 18 at the time they first signed up for a Valve account and have since turned 18 ("Disaffirming Minors") and twenty (20) players who originally signed up after turning 18 ("Adult Plaintiffs") have brought claims on behalf of themselves and every parent, child and adult who were harmed by Skins Gambling.  (FAC at ¶¶ 30-32, 34-35, 37, 42, 44-45, 47-49, 52, 55, 57-62).  Initally, therefore, Valve cannot enforce the SSA as a contract against the Minor Plaintiffs or Disaffirming Adult Plaintiffs.  Second, the Parent Plaintiffs have their own individual claims and are not signatories to any SSA.  Third, the SSA is an invalid contract under Washington law, and therefore none of the parties have agreed to any valid arbitration clause.  Finally, Valve's actions in facilitating third-party gambling websites before the Skins Gambling Update and Cease and Desist Letter are evidence that none of the Plaintiffs received any benefit from the SSA, and that the SSA was in fact an illusory contract.  It would be unconscionable to allow Valve to profit from years of facilitating violations of the SSA, and then allow Valve to invoke the SSA against the Plaintiffs who were harmed specifically by those violations of the SSA.  Further, enforcing the SSA now against Plaintiffs

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 4

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1  would allow Valve to flip a switch and turn the Skins Gambling economy back on, an

2  unconscionable and perverse result of selective enforcement of the SSA.

3      For these reasons, Plaintiffs therefore respectfully request that this Court deny Valve's

4  Motion.

5              ## II.  FACTUAL BACKGROUND

6      Plaintiffs bring claims against Valve and Defendants CSGOLotto Inc., ("Lotto"),

7  OPSkins Group, Inc., ("OPSkins"), James Varga and Phant0mlord, Inc., (collectively "Varga"),

8  CSGo Shuffle ("Shuffle"), Trevor A. Martin ("Martin"), and Thomas Cassell ("Cassell").  Here

9  is a summary of these non-Valve Defendants and their role in the Skins Gambling Enterprise:

| Defendant | Role In Enterprise | Relationship With Other Defendants |
|---|---|---|
| CSGO Lotto | • Skins Gambling Website | • Owned by Defendants Trevor Martin and Thomas Cassell<br>• Used Steam Marketplace/Valve accounts to process gambling transactions |
| Trevor Martin | • Owned Skins Gambling Website<br>• Promoted Skins Gambling on YouTube | • Owner of CSGO Lotto<br>• Used Steam Marketplace/Valve accounts to process gambling transactions<br>• Partner with Cassell |
| Thomas Cassell | • Owned Skins Gambling Website<br>• Promoted Skins Gambling on YouTube | • Owner of CSGO Lotto<br>• Used Steam Marketplace/Valve accounts to process gambling transactions<br>• Partner with Martin |
| CSGO Shuffle | • Skins Gambling Website | • Owned by James Varga<br>• Used Steam Marketplace/Valve accounts to process gambling transactions |
| James Varga | • Owned Skins Gambling Website | • Owner of CSGO Shuffle |

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 5

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

| | | |
|---|---|---|
| | • Promoted Skins Gambling on YouTube | • Used Steam Marketplace/Valve accounts to process gambling transactions |
| OPSkins | • Marketplace for players to sell Skins for real cash | • Used Steam Marketplace/Valve accounts to process sale of Skins |

Plaintiffs allege that, acting in concert, these Defendants created a multi-billion dollar international online gambling ecosystem that, because it is based on a first-person shooter video game, primarily involved teenage boys. Lotto and Martin filed a Motion to Dismiss, and a more extensive discussion of the facts and history of Skins gambling can be found in Plaintiffs' Response. Dkt. #31.

CS:GO is short for Counter Strike: Global Offensive, a video game created and sold by Valve as part of its Counter Strike franchise that began in 1999. FAC at ¶ 83. CS:GO is a "first person shooter" game like more well-known video games Call of Duty and Halo. *Id.* at ¶ 84. To differentiate itself and increase sales, Valve created "Skins", decorated versions of weapons, in 2013. *Id.* at ¶¶ 85-87. Concurrent with the introduction of Skins, Valve also created a market for players to buy, sell, and trade Skins inside the Steam Marketplace (Valve's online platform for all of its products, games and sales). *Id.* at ¶¶ 3, 87. One way players could get Skins was for Valve to give them "weapons cases" during gameplay with an unknown Skin inside. Players could only open the case and use the Skins after buying a "key" from Valve for $2.50 (again, in the Steam Marketplace), knowing that the value of the Skins inside the cases could be more or less than $2.50. *Id.* at ¶ 87.

This is how Valve first connected Skins to gambling. Valve also made opening cases react like a slot machine: the player sees numerous different Skins scroll by of various real-world value, and wherever the spin stops the user gets that item. This video by Defendant Martin shows

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE CORPORATION'S MOTION TO COMPEL ARBITRATION (16-cv-01227) - 6

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

how opening cases looked, felt and sounded like gambling: https://www.youtube.com/watch?v=oqle-lQjac8 (last accessed September 14, 2016). Valve took Skins from an in-game novelty to the backbone of a worldwide online gambling enterprise: by (1) creating a marketplace to give Skins real cash value and (2) imbuing the acquisition of Skins with the look, feel, sound and allure of gambling.

Skins have real cash value, which Valve knew and openly acknowledged. For instance, Valve explained new security measures as necessary because "enough money now moves around the system that stealing virtual Steam goods has become a real business for skilled hackers… . If hackers couldn't move the stolen goods off the hacked account, then they couldn't sell them for real money, and that would remove the primary incentive to steal the account." *Id.* at ¶¶ 114-116, *citing* http://store.steampowered.com/news/19618/. Users can sell Skins on the Steam Marketplace to each other for cash and pay a fee to Valve. FAC at ¶ 89. Players can use cash earned from selling Skins to purchase real-world items directly from Steam, or from outside parties. That is, users could sell Skins for real money on Valve's website, and use that real money to buy games from other developers through the store on Valve's website, from which Valve then takes a portion of the transaction as a cash fee.[1]

Valve was well aware of the multi-billion dollar Skins Gambling economy and the real world cash value of Skins and, until the first lawsuit was filed, worked directly with Skins Gambling sites and other Defendants to facilitate the same conduct that Valve now alleges is unauthorized. *Id.* at, e.g., ¶¶ 3, 5, 9-11. After this lawsuit was filed, an anonymous Valve employee told a reporter that "I don't think the rigged roulette sites in Russia give two f--cks"

---

[1] The Steam Marketplace "is to PC gaming what Apple's App Store is to smartphone apps." *See* http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/.

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 7

about the lawsuit.  *Id.* at ¶ 113 (*citing* http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/).

Bloomberg reported that Skins Gambling "sites, while independently run, use Valve's software and pay out in skins. Valve employees also communicate with CSGO Lounge and have given technical support to the site, said Courtney Timpson, a community administrator and spokesman for CSGO Lounge."  *See* FAC at ¶ 125.  One way in which Valve gave such technical support was to allow certain "third-parties to create thousands of accounts through automation, 'whitelists' or other shortcuts."  FAC at ¶ 110.  In January 2015, Valve instituted a new security measure that required users to prove they were real human beings by viewing a picture and typing out the letters, generally known as a "Captcha" tool.  *Id.* at ¶ 111.  Valve told users that it did this in order to "prevent malware on users' machines making trades on their behalf," that is, requiring a human being go through the physical step of typing in a box on the screen for every single trade.  *Id.* at ¶ 111, *citing* http://steamcommunity.com/groups/tradingcards/discussions/1/622954023422884592/.  However, because Skins Gambling websites must use hundreds or thousands of bot accounts to even exist, in violation of Section 4 of the SSA, Valve specifically "excluded a few of the existing third-party trading services from this requirement so they can continue to function." *Id.*

Valve also helped Skins Gambling websites violate Section 4 of the SSA by allowing OPSkins to create and use bot accounts to facilitate the sale of Skins.  *Id.* at ¶ 14; *see also* http://motherboard.vice.com/read/heres-how-you-make-12000-in-profit-a-day-selling-virtual-guns ("While OPSkins is totally independant (*sic*) from Steam's Community Market, the men say that Valve hasn't given them any trouble. 'We had talks with Valve,' said Brechisci. 'They

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 8

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1    shut us down once. They investigated what we were doing and then they turned us back on and

2    said we were good to go.'").

3           Valve knows many of its users are teenagers and therefore knows who is harmed by the

4    Skins Gambling enterprise.  To create a Valve account users must check a box to indicate they

5    are just thirteen (13) years or older:



18   FAC at ¶ 205.

19          In sum, Plaintiffs allege that Valve affirmatively built, sustained and facilitated the Skins

20   Gambling websites, citing news reports and direct quotes from Valve's employees and

21   representatives online.  *See generally* FAC at ¶¶ 3, 5, 9, 10, 11, 14, 16, 107, 108, 110, 111, 113,

22   114, 115, 116, 119, 120, 121, 122, 125, 126, 143, 144, 176, 177, 178, 179, 180, 181, 182, 199,

23   200.  Plaintiffs' allegations show that, rather than providing Plaintiffs with any benefit from the

24   SSA, Valve's affirmative actions in facilitating third party websites' violation of the SSA actually

25   harmed Plaintiffs.

26

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 9

1   After undersigned counsel filed the first three lawsuits that ultimately were consolidated

2   in this case, Valve took steps to shut down Skins Gambling that have been largely successful.

3   But before doing so, Valve made untold millions—perhaps hundreds of millions—in illegal

4   profits and it was aware and actively facilitated the Skins Gambling ecosystem.  If Valve is

5   allowed to affirmatively help some users violate the SSA to harm Plaintiffs, but then enforce the

6   arbitration clause against Plaintiffs, there is nothing stopping Valve from flipping a switch and

7   re-starting the Skins Gambling system.

### III.  LEGAL STANDARD

9   Under the Federal Arbitration Act, a court's role is "limited to determining (1) whether a

10   valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the

11   dispute at issue."  *James Hardie Bldg. Prods. v. Good, Inc.*, 2013 U.S. Dist. LEXIS 102351 at

12   *5-6 (W.D. Wash. July 22, 2013), *citing Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d

13   1126, 1130 (9th Cir. 2000).  "[A]n order to arbitrate . . . should not be denied unless it may be

14   said with positive assurance that the arbitration clause is not susceptible of an interpretation that

15   covers the asserted dispute."  *Coppock* 2013 U.S. Dist. LEXIS at *11 (*citing AT&T Techs., Inc.,*

16   *v. Comm'cns Workers of Am.*, 475 U.S. 643, 650 (1986).  "In the absence of any express provision

17   excluding a particular grievance from arbitration, . . .only the most forceful evidence of a purpose

18   to exclude the claim from arbitration can prevail."  *Id.*, *citing Warrior & Gulf Nav. Co.*, 363 U.S.

19   574, 582-83 (1960)).  Plaintiffs here have met their burden to show "that the agreement does not

20   cover the claims at issue."  *Id.*, *citing Green Tree Fin. Corp.-Ala.* v. *Rudolph*, 531 U.S. 79 (2000).

21   "In determining whether the parties agreed to arbitrate, courts apply ordinary state-law

22   contract principals."  *Peters v. Amazon Servs. LLC,* F. Supp. 3d. 1165, 1170 (W.D. Wash. Nov.

23   5, 2013) (*citing Options of Chicago, Inc., v. Kaplan*, 514 U.S. 938, 944 (1995)).  "Washington

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 10

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1   courts apply the manifest theory of contract interpretation: '[t]he role of the court is to determine

2   the mutual intentions of the parties according to the reasonable meaning of their words and acts.'"

3   *Id.* at 1170, *citing Fisher Props. Inc. v. Arden-Mayfair, Inc.,* 106 Wn.2d 826, 837, 726 P.2d 8

4   (1986).

5                                        **IV.  DISCUSSION**

6          **A.  Plaintiffs' Claims Arise From Unauthorized Use of Steam
7          Marketplace That Violated The SSA.**

8          Section 11 of the SSA is crystal clear that the arbitration agreement does not encompass

9   the dispute here:

10
11               However, this Section does not apply to the following types of
                 claims or disputes, which you or Valve may bring in any court with
12               jurisdiction: (i) claims of infringement or other misuse of
                 intellectual property rights, including such claims seeking injunctive
13               relief; and (ii) claims related to or arising from any alleged
                 unauthorized use, piracy or theft.

14
15   SSA, Valve's Motion at Ex. G, pg. 11.  Valve's SSA defines unauthorized use in Section 4: "You

16   may not use Cheats, automation software (bots), mods, hacks, or any other unauthorized third-

17   party software, to modify or automate any Subscription Marketplace process." *Id.* at pg. 7.  By

18   using the phrase "any other unauthorized third-party software" after a list of types of third-party

19   software, Valve is defining "automation software (bots)" as unauthorized third-party software.

20          The arbitration clause thus excludes Plaintiffs' claims because Valve alleges that these

21   claims are "related to or arising from" Skins gambling on third party websites.  *See* Valve's

22   Motion at pg. 1.  ("Plaintiffs claim they lost money gambling on unrelated third-party websites

23   that have sprung up to capitalize on CS:GO's global success… .  The sites facilitate gambling by

24   misusing Steam accounts and exploiting Steam's trading feature, in violation of the SSA.").

25   According to Valve, the gambling sites "misusing Steam accounts and exploiting Steam's trading

26

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 11

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

feature" create "automated Steam accounts that make the same web calls as individual users." FAC at ¶188, *citing* http://store.steampowered.com/news/22883/.   These automated Steam accounts are the "bots" that are specifically unauthorized under Section 4 of the SSA, and it is only because of these accounts that Skins Gambling websites can actually exist.

Further, third-party websites maintaining their Valve accounts for commercial use by profiting from illegal online gambling is plainly unauthorized use of Steam accounts and the SSA.  Valve sent gambling websites a Cease and Desist letter in which it described the Skins Gambling Websites as "unlicensed and in violation of the SSA." *Id.* at ¶ 197.  Valve's SSA only grants a license for "non-commercial use (except where commercial use is expressly allowed herein or in the applicable Subscription Terms.)".  *Id.* at Section 2A, pg. 3.  Commercial use is further unauthorized under Section 2G ("You may not use the Content and Services for any purpose other than the permitted access to Steam and your Subscriptions, and to make personal, non-commercial use of your Subscriptions…") and Section 2G(iii) ("you are not entitled to…(iii) exploit the Content and Services or any of its parts for any commercial purpose…").  *Id.* at pg. 4.  In Valve's Cease and Desist letter, it alleged: "We are aware that you are operating one of the gambling sites listed below.  You are using Steam accounts to conduct this business…. Under the SSA Steam and Steam services are licensed for personal, non-commercial use only.  Your commercial use of Steam accounts is unlicensed and in violation of the SSA."  FAC at ¶ 197 (entire Cease and Desists reproduced below):

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 12

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

We are aware that you are operating one of the gambling sites listed below. You are using Steam accounts to conduct this business. Your use of Steam is subject to the terms of the Steam Subscriber Agreement ("SSA"). http://store.steampowered.com/subscriber_agreement/. Under the SSA Steam and Steam services are licensed for personal, non-commercial use only. Your commercial use of Steam accounts is unlicensed and in violation of the SSA. You should immediately cease and desist further use of your Steam accounts for any commercial purpose. If you fail to do this within ten (10) days Valve will pursue all available remedies including without limitation terminating your accounts.

Karl Quackenbush

General Counsel, Valve Corp.

Thus, Valve has specifically alleged unauthorized use in three ways, all of which are related to and give rise to Plaintiffs' claims: creating of automated bot accounts, use of Steam accounts to promote illegal gambling; and use of Steam accounts for commercial purposes. Plaintiffs' claims all arise from or relate to Skins Gambling websites, which require the commercial use of Steam, through the use of unauthorized third party software to create hundreds or thousands of automated bot accounts, to engage in illegal online gambling.

This exclusion clause should be read to exclude Plaintiffs' claims because courts give provisions such as "claims related to or arising from any alleged unauthorized use" in arbitration clauses "the broadest possible interpretation." *See Ownzones Media Network, Inc., v. Sys. In Motion, LLC*, 2014 U.S. Dist. LEXIS 129643 *7 (W.D. Wash. Sept. 12, 2014) (Robart, J.) ("When evaluating arbitration agreements, courts give the language 'arising in connection with' the broadest possible interpretation.") (citations omitted).  This is "amply supported by Ninth Circuit precedent" that "'any dispute' provisions are 'broad and far reaching' in scope." *Ekin v. Amazon Servs., LLC*, 84 F.Supp. 3d 1172, 1178, fn. 9 (W.D. Wash. Dec. 10, 2014) (*citing Chiron* 207 F.3d at 1131).  The exclusion provision here should be read just as broadly.  Washington law is clear that when "interpreting contracts, words are generally given their ordinary meaning and

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE CORPORATION'S MOTION TO COMPEL ARBITRATION (16-cv-01227) - 13

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

the parties' mutual intent is effectuated." *Donatelli v. D.R. Strong Consulting Enr'rs, Inc.*, 179 Wn.2d 84, 312 P.3d 620, 621 (2013) (citations omitted).  The Court does not even need to examine the merits of the underlying dispute here: all that is required is to find that there is "any **alleged** unauthorized use." (emphasis added).  Plaintiffs have made significant allegations of unauthorized use here, and Valve itself alleges that the claims arise from gambling that was unauthorized use in three ways.  Thus, these allegations are excluded from the arbitration clause.

This Court interpreted a phrase like the "related to or arising out of" broadly in *Coppock* when it determined that all claims by a plaintiff for violations of federal law concerning telephone calls were related to a credit card account with an arbitration clause in its agreement.  *Coppock*, 2013 U.S. Dist. LEXIS at *14.  The plaintiff there brought claims for debt collection phone calls related to her Citibank credit card.  *Id.* at *14-15.  The arbitration agreement was broad and applied to all claims relating to the account.  *Id.*  "That Citi may have mistakenly believed that Coppock's account was in arrears does not change the fact that the collection call was related to the account."  *Id.* at *15.  After the plaintiff transferred her balance, Citi stopped calling, which "reinforces the conclusion that the calls were related to her account and her relationship with Citi."  *Id.*

Courts across the country have applied express exclusion provisions of arbitration clauses to deny motions to compel arbitration like Valve's Motion.  For instance, just recently in *Verinata Health, Inc., v. Ariosa Diagnostics, Inc.*, the Court of Appeals for the Federal Circuit upheld a District Court's conclusion that a defendant's counterclaims were expressly excluded from an arbitration agreement.  2016 U.S. App. LEXIS 13557 *1-2 (Fed. Cir. July 26, 2016).  The parties had a supply agreement that "provided an arbitration clause and an exclusion-from-arbitration clause: … This Section 31(c) shall not apply to, and no arbitration shall resolve, disputes relating

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 14

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

to issues of scope, infringement, validity and/or enforceability of any Intellectual Property Rights." *Id.* at *3-4. Illumina and Ariosa signed the contract for DNA analysis tools. *Id.* at *2-3. A dispute arose about patent and intellectual property rights, and a third party sued Ariosa. *Id.* at *4. Illumina acquired the third-party and also filed suit for patent infringement. *Id.* at *4. Ariosa brought counterclaims for breach of the supply agreement, breach of the covenants of good faith and fair dealing. *Id.* at *5. Illumina moved to compel arbitration of those claims. *Id.* The court upheld the trial court's denial of the motion, reasoning that "Illumina put the scope of licensed patent rights in issue by suing Ariosa for patent infringement. The counterclaims at issue - declaratory judgment of non-infringement, breach of contract, and breach of certain covenants - are predicated on the notion that the infringement allegations cannot stand because of the licensing provisions within the supply agreement." *Id.* at *11.

The facts here, are similar to *Ariosa,* where the Court held the language of the exclusion was broad and applied it broadly: "To the extent Illumina suggests that the word 'issues' narrows the import of the exclusion-from-arbitration clause, we disagree because the full phrase links 'issues' with the modifier 'relating to': 'disputes relating to issues of.'" *Id.* at *13. Here, the language of the exclusion-from-arbitration clause is similarly broad: "claims related to or arising from any alleged unauthorized use…" Exhibit G to Valve's Motion at pg. 11. The exclusion should be applied here like the court did in *Ariosa* to deny Valve's Motion.

Similarly, in *Rebolledo v. Tilly's, Inc.*, the California Court of Appeals found that an arbitration clause that specifically excluded "workers' compensation claims, unemployment insurance[,] and matters governed by the California Labor Commissioner." 228 Cal. App. 4th 900, 907 (Cal. App. 2014). The court there rejected the "Employer's strained interpretation of the language" to exclude claims that both parties agreed involved "matters governed by the

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 15

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1   California Labor Commissioner."  *Id.* at 917; *see also Richardson's v. Bart's Car Store, Inc.*,

2   2014 U.S. Dist. LEXIS 173208 *18 (S.D. Ind. Dec. 15, 2014) (denying Motion to Compel

3   Arbitration without prejudice until sufficient evidence about whether plaintiff's claims were

4   more than $45,000 exception to arbitration clause).

5           Here, it is undisputed Plaintiffs' claims arise out of Skins Gambling websites and Valve's

6   involvement in the creation and facilitation of those websites.  *See* Valve's Motion at pg. 1 and

7   FAC at ¶3 ("Valve has knowingly allowed an illegal online gambling market and has been

8   complicit in creating, sustaining and facilitating the market.").  It is undisputed that these Skins

9   Gambling websites could not engage in gambling transactions without technological

10  workarounds that allow them to create, manage and effectuate trades through hundreds or

11  thousands of automated Valve bot accounts and that the claims arise from these activities by the

12  third party and Defendant Skins Gambling sites and Valve.  *See* FAC at ¶¶ 5, 10, 11, 119, 120,

13  198, 199, Valve's Motion at pg. 1, and Valve's Cease and Desist letter (*discussed in detail

14  above*).  It is undisputed that Plaintiffs allege Valve had the power to shut down these third party

15  websites, and in fact, once Valve issued a Cease and Desist letter threatening to do just that, Skins

16  Gambling websites shut down.  FAC at ¶¶ 17, 195-97.  It is undisputed that Plaintiffs have alleged

17  the Skins Gambling websites were illegal gambling, and that their activities constituted

18  commercial activity.  FAC at ¶¶ 5, 18, 227, 237, 247, 262.

19          This is "forceful evidence" that an express provision of the SSA excludes Plaintiffs'

20  claims from the arbitration clause.  The language in Valve's SSA that "claims related to or arising

21  from any alleged unauthorized use" is clear and unambiguous and not subject to any reasonable

22  interpretation other than its plain meaning.  Valve's SSA even specifically defines "automation

23  software (bots)" as "unauthorized third-party software."  *See* Ex. G to Valve's Motion at Section

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 16

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

4. "Misuse" of the Steam Marketplace cannot plausibly be described as anything other than the type of "unauthorized" use expressly exempted in Section 11.  The SSA also prohibits illegal activity and commercial use, and Valve has alleged and admitted that the Skins Gambling websites engaged in both of those things.  *See* Cease and Desist Letter, FAC at ¶ 197.  All of Plaintiffs' claims are "related to or arising from" Skins Gambling, which Valve alleges is "unlicensed and in violation of the SSA."  Therefore, the express provision of the SSA excluding claims related to and arising from allegations of unauthorized use applies to all of Plaintiffs' claims; and accordingly, this Court must deny Valve's Motion.

### B. Valve Cannot Enforce The SSA Against Minor Plaintiffs, Disaffirming Adult Plaintiffs And/Or Parent Plaintiffs.

Valve cannot enforce a contract against minors, nor against any Plaintiffs who originally signed a contract as a minor, nor against people that indeed **never signed a contract**.  These fundamental principles of contract law cannot be magically undone by an arbitration clause in an online user agreement, especially in light of Valve's conduct here.  Further Plaintiffs have effectively disaffirmed an SSA from which they received no benefit or protection.  Valve should not be allowed to use the SSA as both a "sword and shield" selectively enforcing it after profiting from and condoning its violation for years.

### 1. Valve Cannot Enforce Its SSA Against Minor Plaintiffs.

Valve cannot enforce the arbitration clause in the SSA against Minor Plaintiffs.  *See* RCW 26.28.030.  Federal courts "apply ordinary state-law principles that govern the formation of contracts" to evaluate the validity of an agreement to arbitrate.  *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation omitted). An arbitration agreement must be "enforceable under the laws of the state where the contract was formed."  *Ingle*, 328 F.3d at 1170. Here, by the express terms of the SSA; the parties entered into the SSA in Washington and

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 17

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1   Washington law controls any disputes arising under the SSA.  *See, e.g.,* Dkt. #23-9 at p. 10 ("You

2   agree that this Agreement shall be deemed to have been made and executed in…Washington,

3   U.S.A. and any dispute arising hereunder shall be resolved in accordance with the law of

4   Washington").

5          Washington's Uniform Arbitration Act, RCW 7.04A *et seq.*, provides that agreements to

6   arbitrate are enforceable, "except upon a ground that exists at law or in equity for the revocation

7   of contract." RCW 7.04A.060(1).  Disaffirmance of a contract entered into by a minor provides

8   one such ground because under Washington law, because contracts with minors are voidable and

9   unenforceable if the minor disaffirms the contract. RCW 26.28.030.  A minor, through a legal

10  guardian acting on his or her behalf, may disaffirm a contract prior to turning 18 years old. *See,*

11  *e.g., Lubin v. Cowell*, 25 Wn.2d 171, 170 P.2d 301 (1946).  A simple public policy underlies this

12  allowance for disaffirmance: the law's "first consideration" in such cases is the welfare of minors.

13  *Snodderly v. Brotherton*, 173 Wash. 86, 90–91, 21 P.2d 1036 (1933). As such, this policy

14  "protect[s] the infant against improvidence and folly, because his mind and judgment are

15  immature. The improvidence… is not simply the making of an unwise contract, but very often is

16  the use or misuse to which the property is put after it is purchased." *Snodderly*, 173 Wash. at 90-

17  91.   That long-standing, well-reasoned, legal tenet and public policy is especially applicable

18  here, where minors as young as thirteen (13) years old were enticed into an illegal online

19  gambling system though Valve's enterprise.

20         When minors disaffirm a contract, courts will consider the contract retroactively void,

21  such that a party like Valve never acquired rights under it.[2]  *See Plummer v. Northern Pac. Ry.*

---

[2] Courts place limitations on such retroactivity only to prevent "those who deal with an infant's property [from becoming] tort-feasors as of a time when they did no wrong…" *Wise v. Truck Ins. Exch.*, 11 Wn. App. 405, 409, 523 P.2d 431 (1974) (quoting *Casey v. Kastel*, 237 N.Y. 305, 312, 142 N.E. 671 (1924)). Here, Valve's tortious conduct existed independently of the SSA and this limitation does not apply.

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 18

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

*Co.*, 98 Wash. 67, 70, 167 P. 73,74 (1917) at 70. In the eyes of the courts, "the rights of minors are not coextensive with those of adults." *York v. Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297, 330, 178 P.3d 995 (2008).  Although Valve may complain that such a result is unfair, "[s]imply stated, one who provides a minor with goods and services does so at her own risk." *I.B. ex rel. Fife v. Facebook, Inc.,* 905 F.Supp.2d 989, 1000 (N.D.Cal.2012)(internal quotation omitted). Valve clearly intended to enter into contracts with anyone over the age of thirteen (13).  FAC at ¶ 197.

Courts require only "some positive act of disaffirmance" by a minor to disaffirm a contract.  *Sims v. Everhardt*, 102 U.S. 300, 26 L. Ed. 87 (1880).[3]  Irrespective of the nature of the act, "[d]isaffirmance by a minor rescinds the entire contract, rendering it a nullity."  *Fife v. Facebook*, 905 F.Supp.2d at 1000.  Plaintiffs disaffirmed the entire SSA, including its arbitration provision, by filing this lawsuit. FAC at ¶ 344. Although the minor must return any money or property received as a result of entering into the contract upon disaffirmance, here Minor Plaintiffs possess nothing to return.  RCW 26.28.030; *Lubin v. Cowell*, 25 Wn.2d 171, 170 P.2d 301 (1946).  Valve's SSA does not provide for the exchange of anything: no money or property changed hands under the terms of the SSA; the Plaintiffs purchased software and Skins and gave cash in exchange.  The Minor Plaintiffs in this case received only the opportunity play video games as a result of entering into the SSA, and have nothing to return to Valve after disaffirming the entire SSA.[4]

---

[3] Courts continued follow this permissive standard long after the *Sims* decision. *See, e.g., Del Santo v. Bristol Cty. Stadium, Inc.*, 273 F.2d 605, 607 (1st Cir. 1960) ("any acts or words showing unequivocally a repudiation of the contract are sufficient to avoid it").

[4] *See, e.g.,* FAC at  ¶ 7 ("Valve has created Skins out of thin air and can therefore control the ultimate real world value of these items…"); ¶ 16 ("All of the gambling transactions take place under Valve's virtual roof... Skins never actually leave Valve's servers"); *see also* Dkt. # 23-9, Steam Web SSA August 28, 2013, at pp. 2-4 ("Each Subscription allows you to access particular services, Software, and/or other content…. Valve hereby grants, and

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 19

In its Motion, Valve cites to *Snodderly v. Brotherton,* 21 P.2d 1036, 1037, (Wash. 1933) but tellingly leaves out the pertinent part of the court's holding directly after the part of the decision Valve quotes, the court continued:

> The statute does not require the restoration of the property in its original condition or in lieu thereof the payment of its equivalent in value, nor does it require the minor to compensate the other party for the use or depreciation of the property, but merely requires him to restore that which he retains or controls.
>
> It is the general rule, announced and followed by a great majority of the courts in this country, that an infant, on disaffirming his contract, is required to return only so much of the consideration as remains in his hands in specie, and is not required to make good to the other party the portion of the consideration that has been disposed of, lost, or wasted during his infancy. This is particularly true where the contract is for the purchase of personal property.

*Snodderly v. Brotherton*, 21 P.2d at 1037.

Plaintiffs' use of Valve's Steam Marketplace under the SSA's license may be considered property disposed of, lost, or wasted, and does not bar Plaintiffs' disaffirming the contract; there is nothing unfair about allowing Minor Plaintiffs - who paid Valve cash for Skins, video games and other items - to disaffirm the SSA which provided them no real benefit.  Minor Plaintiffs cannot give back their time playing video games or Skins lost to gambling, and buying and playing other video games at various times does not change this.

Thus, the holding in *Snodderly* that Valve relies upon does not support its argument here. Nor does its reliance upon *Dawes v. Facebook, Inc*., 885 F.Supp.2d 894 (S.D.Ill. 2012). That is because, in *I.B. ex rel. Fife v. Facebook* (a subsequent case examining whether minors could disaffirm a Facebook contract), the court denied Facebook's motion to dismiss and rejected

---

you accept, a limited, terminable, non-exclusive license and right to use the Software… All title, ownership rights and intellectual property rights in and to the Software… are owned by Valve US…").

Facebook's argument from *Dawes* argument that the minors couldn't disaffirm because they had received benefits of the contract.  905 F.Supp.2d at 1002-03.  The court there noted that any unfair windfall to the plaintiffs as the result of its decision "might have been avoided by declining to enter into the contract [with minors]."  905 F.Supp.2d at 1003 (internal citation omitted).

Ultimately, Valve's argument fails because it has not met its burden to show that the SSA conferred any real benefit or windfall on Minor Plaintiffs here, or to show that Minor Plaintiffs have "fruits" it would be unfair to retain after disaffirming the SSA, unlike in the cases Valve cites.[5]  To the contrary, the Minor Plaintiffs were harmed by their contract with Valve, harmed by Valve's violations of the SSA and harmed by their purchase of Skins from Valve.  FAC at ¶¶ 208-209.  As discussed in depth above, Valve failed to enforce the terms of the SSA against Skins Gambling websites that engaged in illegal activity, commercial activity, and the use of automated software bots, which harmed Minor Plaintiffs.

Minor Plaintiffs paid Valve money, and got access to video games and in-game items in return.  Minor Plaintiffs then lost these items, and they cannot give back something they do not have, or something that is not concrete (time spent playing video games).  Nor does continuing to use Steam after disaffirming the SSA mean that the minor Plaintiffs reaffirmed the SSA.  Such an agreement is specious: the Minors are paying Valve money for goods, the SSA is ancillary to this transaction and Valve cannot continuously attempt to get minor children to agree to a contract they have no capacity to enter into in order to protect themselves from Plaintiffs' claims here, especially since Valve has not honored that contract in the past and could, tomorrow, decide not

---

[5] *See, e.g. Peers. v. McLaughlin*, 26 P. 119 (1891)(Minor could not disaffirm and retain interest in real property); *AV v. iParadigms*, 544 F. Supp. 2d 473, 481 (E.D. Va. 2008)(Minor could not disaffirm because they retained good standing in classes); *Value Auto Credit, Inc. v. Talley*, 727 So. 2d 61, 61 (Ala. 1991)(minor could not disaffirm and retain automobile); *Sheller v. Frank's Nursery*, 957 F.Supp. 150 (1997)(retained benefit of employment contract).

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 21

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1    to honor it again.

2    **2. Valve Cannot Enforce Its SSA Against Disaffirming Minors.**

3        In addition to the Minor Plaintiffs' ability to disaffirm the SSA, a Plaintiff who entered

4    into the SSA as a minor but who has since turned 18 may also disaffirm it "within a reasonable

5    time after he or she attains his or her majority…". RCW 26.28.030.  Like the Minor Plaintiffs,

6    these Disaffirming Minor Plaintiffs have disaffirmed the entire SSA by participating in this

7    lawsuit, and cannot give back their time playing video games or Skins lost to gambling.  While

8    there is no clear law on what is "reasonable" time, the legal online gambling age in the only three

9    states to legalize online gambling, Delaware, Nevada, and New Jersey, is 21, which makes age

10   21 a reasonable age at which someone is an adult for purposes of online gambling. *See* Del. Code

11   Ann. § 4810 ("No person who is under the age of 21 shall wager on the video lottery, sports

12   lottery, table games, Internet table games or Internet video lottery."); N.J.A.C. 13:69O-1.3(b)(5)

13   ("In order to establish an Internet or mobile gaming account, a casino licensee shall…Verify that

14   the patron is of the legal age of 21."); NGC Reg. 5A.110(1) and (2) ("Before allowing or

15   accepting any wagering communication from an individual to engage in interactive gaming, an

16   operator must register the individual . . .only if the individual provides date of birth showing that

17   the individual is 21 years of age or older").  Therefore, all Disaffirming Minor Plaintiffs, who

18   were under the age of 21 at the time of the filing of the first action in this case, have disaffirmed

19   within a reasonable time, and as stated, their continuing to pay Valve money for video games and

20   other items does not undo that.

21       Further, these Disaffirming Minors have not reaffirmed the contract with continued use

22   because Valve makes not attempt to differentiate between them as 18 year olds and minors.

23   Simply put, the SSA is specifically targeted at **13 year olds**, and turning 18 changes nothing

24

25

26

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 22

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

about how users interact with Valve.  FAC at ¶ 205:

☐ I agree AND am 13 years of age or older

.

Valve does not communicate to users that, once they have turned 18, that somehow they are doing anything differently than they have done repeatedly in the past as a minor; does not communicate to users the rights they are giving up by agreeing again and does not ensure that users who have turned 18 since they first signed up for Valve understand what they are doing may have a different impact now than before, or that Valve may decide it does not want to enforce the SSA against some users but enforce it against others.

### 3. Valve Cannot Enforce Its SSA Against the Parent Plaintiffs.

The SSA also fails to bind the parent Plaintiffs bringing individual claims against Valve. Valve and Parents do not have a contractual relationship, and Valve does not even attempt  to argue in its Motion that they do.  Valve cannot.  Instead, Valve argues that the Parent Plaintiffs' claims are solely derivative of their minor children's claims, but to do so Valve relies on inapposite cases based on derivative contract claims.  Valve's Motion at 17:9-24.

The cases Valve cites are inapposite because the Parent Plaintiffs have not brought contract claims against Valve; and instead have alleged their money was used by their minor children, and therefore that Parent Plaintiffs have been injured personally.  *See* FAC at ¶¶ 63-79, 210. That was not the case relied upon by Valve of *Townsend v. Quadrant Corp.*, 173 Wn.2d 451, 453–54, 268 P.3d 917, 918 (2012), where parents were seeking to keep their non-signatory children's claims out of arbitration.  The court there determined that, unlike here, "the children are attempting to enforce the terms of the [contract] and that they base their claim for breach of warranty on the warranties contained therein." *Id.* at 461.  "Although the children received the benefit of the bargain in the transaction with [defendant] to the same extent as their parents, they now seek to avoid the burden of arbitration imposed by the [contract]." *Id.* at 461-62.

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 23

The facts of *Townsend* are the exact opposite of the case at bar.  The Parent Plaintiffs enjoyed no benefit from the SSA; they were in fact harmed by their child's relationship with Valve because their money was used in illegal gambling activity without their knowledge.  FAC at ¶¶ 63-79, 210.  If Valve had not created and facilitated the Skins Gambling economy, the Parent Plaintiffs would not have suffered harm in the first place.  Ntably, the Parent Plaintiffs received **no benefit** from the SSA, nor could they.  As a result, the Parent Plaintiffs have a claim against Valve for damages arising from its facilitation of illegal gambling, and they are not required to arbitrate those claims under the SSA because they are not parties to the SSA.

## C.  The SSA Is Not A Valid, Enforceable Contract Against All Plaintiffs.

### 1.  Valve Has Not Met Its Burden of Showing An Enforceable Agreement Exists.

Valve asserts that "every Steam Subscriber, CS:GO Purchaser, and Skin Buyer Agrees to the SSA, Including its Arbitration Provision," but Valve introduces no evidence showing that any of the named Plaintiffs actually clicked "I agree" when presented with the SSA.  (Valve's Motion at 3).  As "the party seeking to compel arbitration, [Valve] has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence."  *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citation omitted).  Valve only proffers "broad assertions as to its general practice" of requiring players to click "I agree" on the SSA at various points, but it fails to introduce any evidence, such as records that any named Plaintiff actually clicked "I agree" at any particular point, that might meet Valve's burden here.  *Briones v. Fitness Int'l, LLC*, No. SACV 16-44-JLS, Slip Op. at 7 (C.D. Cal. Aug. 5, 2016) (attached as Exhibit 1) (denying motion to compel arbitration where the movant failed to present evidence that plaintiff actually "saw each agreement before signing").  Such empty, unsupported statements are not

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 24

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1 proof.  Valve's Motion should be denied for the simple reason that Valve fails to meet its burden

2 of showing that Plaintiffs agreed to the SSA.

### 2. The SSA Is Void for Illegality.

4 It is beyond dispute that "agreements to arbitrate [may be] be invalidated by 'generally

5 applicable contract defenses, such as fraud, duress, or unconscionability.'"  *AT&T Mobility LLC*

6 *v. Concepcion*, 563 U.S. 333, 339, 131 S. Ct. 1740, 1746, 179 L. Ed. 2d 742 (2011). "[N]o

7 principle of law is better settled than that a party to an illegal contract cannot come into a court

8 of law and ask to have his illegal objects carried out." *Yoo v. Jho*, 147 Cal. App. 4th 1249 (2007)

9 (citations omitted).  "The same rule applies if the contract grows immediately out of and is

10 connected with an illegal act." *Golberg v. Sanglier*, 96 Wash. 2d 874, 879 (1982).  Skins

11 Gambling is illegal under Washington law. RCW §§ 9.46.010, 9.46.0237, 9.46.240.  It is

12 undisputed that Plaintiffs have alleged the Skins Gambling websites were illegal gambling.  FAC

13 at ¶¶ 5, 18, 227, 237, 247, 262.  Yet, Valve asks this Court now to enforce the arbitration provision

14 and class waiver in its SSA—the very agreement that governed and enabled the illegal

15 gambling—to effectively insulate it from liability, and require Plaintiffs to proceed by way of

16 expensive, individual arbitrations that have little hope of vindicating their rights and certainly

17 would not ensure the practice is ended going forward.  This Court should not allow Valve to

18 insulate itself from liability by invoking such an illegal contract.

### 3. Valve's Arbitration Provision Is Unconscionable.

21 Under Washington law, "Agreements may be unconscionable in two ways: substantively

22 and procedurally. . . . Either type of unconscionability alone is sufficient to void a contract."

23 *JZK, Inc. v. Coverdale*, 192 Wash. App. 1022 (2016); *see also McKee v. AT & T Corp.*, 164

24 Wash. 2d 372, 396, 191 P.3d 845, 857 (2008).  There is no dispute that the SSA is presented on

25

26

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 25

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1  a take-it-or-leave-it basis, and that consumers have no option to reject, opt out of, or negotiate

2  any of its terms.  (Boyd Decl.) Dkt. # 23.  As such, the SSA presents a classic contract of adhesion

3  and is procedurally unconscionable.  *See Zuver v. Airtouch Commc'ns, Inc.*, 153 Wash. 2d 293,

4  303, 103 P.3d 753, 759 (2004)  ("We have adopted the following factors to determine whether

5  an adhesion contract exists: '(1) whether the contract is a standard form printed contract, (2)

6  whether it was "prepared by one party and submitted to the other on a 'take it or leave it' basis",

7  and (3) whether there was '"no true equality of bargaining power' between the parties."");

8  *Armendariz v. Found. Health Psychcare Serv.*, 24 Cal. 4th 83, 113 (2000) ("'The term [contract

9  of adhesion] signifies a standardized contract, which, imposed and drafted by the party of

10  superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to

11  the contract or reject it.'") (citations omitted). Under Washington law, the SSA is a contract of

12  adhesion and, as such, is procedurally unconscionable.

13  

14       The SSA also is substantively unconscionable.  For instance, Valve's SSA includes not

15  only a class action waiver, but a waiver of claims under California's Private Attorney General

16  Action (the "PAGA waiver").  (Boyd Decl. Exh. G at ¶ 11 ((YOU . . . AGREE NOT TO BRING

17  OR PARTICIPATE IN A CLASS OR REPRESENTATIVE, PRIVATE ATTORNEY

18  GENERAL ACTION OR COLLECTIVE ARBITRATION . . ."))   The Ninth Circuit has

19  squarely rejected such provisions as unenforceable and unconscionable.  *Sakkab v. Luxottica

20  Retail N. Am.*, 803 F.3d 425 (9th Cir. 2015).  Not only does the SSA include this patently

21  unconscionable and unenforceable provision, but it makes clear that if this PAGA waiver is

22  "illegal or unenforceable, you and Valve agree that it shall not be severable, that this entire

23  [arbitration] Section shall be unenforceable and any claim or dispute would be resolved in court

24  and not in collective arbitration."  (Boyd Decl. Exh. G at ¶ 11.)  Because the PAGA waiver is

25  

26  

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 26

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1   unenforceable, but not severable from the rest of the SSA, the entire SSA is unenforceable.  *See*

2   *Lowden v. T-Mobile USA, Inc.*, 512 F.3d 1213, 1219 (9th Cir. 2008) ("Having determined that

3   the (nonseverable) class action waiver is invalid under Washington law, we hold that T–Mobile's

4   arbitration agreement is unenforceable under Washington law."); *Scott v. Cingular Wireless*, 160

5   Wash. 2d 843, 847, 161 P.3d 1000, 1003 (2007) ("Since the arbitration clause itself provides that

6   if any part is found unenforceable, the entire clause shall be void, there is no basis to compel

7   arbitration.").

8

9       Valve's arbitration clause also is substantively unconscionable because it would require

10  claimants to front the costs of arbitration (despite its promise to reimburse claimants at the

11  conclusion of proceedings).  *See, e.g.*, *Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185, 1208

12  (N.D. Cal. 2015), *aff'd in part, rev'd in part on other grounds*, No. 15-16178, 2016 WL 4651409

13  (9th Cir. Sept. 7, 2016).  In the SSA, Valve promises to "reimburse" claimants for the costs of

14  arbitration if they seek $10,000 or less.  (Boyd Decl. Exh. G.)  This means claimants have to

15  front these costs, which could mount to thousands of dollars and put justice out of reach for many,

16  particularly where their claims are for relatively small amounts (and, if a particular claimants

17  seeks to recover a larger sum, he or she will have to foot the entire bill for arbitration).  Not only

18  would these claimants have to pay significant filing fees (http://info.adr.org/feeschedule/) but an

19  arbitrator is paid hourly, and under the AAA Commercial Arbitration Rules, which the SSA says

20  would apply, claimants would be responsible for half of these hourly charges.  *See* AAA

21  Commercial Arbitration Rule R-54, R-55.  Valve's language "poses a significant risk that

22  [claimants] will have to bear large costs to vindicate their statutory right[s]," and for this

23  additional reason is unconscionable.  *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24

24  Cal. 4th 83, 110, 6 P.3d 669, 687 (2000).

25

26

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 27

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

Finally, Valve and the Skins Gambling enterprise was targeted at minor children, and Valve used the Steam Marketplace to profit from inducing those minor children into an illegal online gambling system.  For Valve to avoid any responsibility for this shows how substantively unconscionable it would be to enforce the arbitration clause of the SSA.  Further, enforcing the SSA would allow Valve to restart the Skins Gambling enterprise and start profiting again, secure in the knowledge that the SSA shields it from any responsibility for its conduct.

Thus, Valve's arbitration provision should not be enforced because it and the SSA are procedurally and substantively unconscionable.

### 4.  Valve's SSA Is An Illusory Contract Because As Shown Above, Valve's Performance Is In Its Sole Discretion.

Ultimately, Valve's actions shows that the SSA is not a real contract and in fact is an illusory document.  "In Washington, whether a promise is illusory generally turns on whether there is adequate consideration."  *Sak & Assocs., Inc. v. Ferguson Constr., Inc.*, 189 W. App. 405, 411, 357 P.3d 671, 674 (Wash. Ct. App. 2015).  "'If the provisions of an agreement leave the promisor's performance entirely within his discretion and control, the "promise" is illusory.  Where there is an absolute right not to perform at all, there is an absence of consideration.'"  *Id.* at 675 (citations omitted).  "An illusory promise is one that is so indefinite that it cannot be enforced, or by its terms makes performance optional or entirely discretionary on the part of the promisor."  *Lane v. Wahl*, 101 Wash. App. 878, 6 P.3d 621, 624 (2000).

Valve has not treated the SSA as a document that it is bound to and its performance is therefore discretionary.  It has done this by helping Skins Gambling breach the SSA.  Valve had the power to stop this unauthorized use the entire time, but chose not to: the SSA allows Valve to cancel user accounts "at any time," including the accounts of users that breach the SSA.  (Ex. G § 9.C.)  It is a breach to use CS:GO "for any commercial purpose," but Valve encouraged,

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE CORPORATION'S MOTION TO COMPEL ARBITRATION (16-cv-01227) - 28

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

enabled, and profited from the Skins Gambling websites.  (*Id.* § 2.G.)  The SSA also prohibits players from using "bots" or other software "to modify or automate any Subscription Marketplace process," but Valve in fact aided and abetted the Skins Gambling websites in doing just this, in violation of the SSA.  (*Id.* § 4.)  Thus, Valve could cancel Plaintiffs' accounts at any time for breach, even as it continued to encourage and facilitate such breaches that harmed Plaintiffs.  FAC at ¶¶ 28-79.

Valve's actions in allowing and facilitating the Skins Gambling websites to violate the SSA but then turning around and seeking to enforce the SSA against Plaintiffs shows that Valve's "performance [was] entirely within [its] discretion and control" and, accordingly, the SSA is illusory.  *Sak & Assocs.*, 189 W. App. at 411.  Its arbitration provision should not be enforced to allow Valve to escape liability for its conduct.

Valve's often-exercised, unilateral right to modify the SSA (*id*. ¶ 8) is yet another unconscionable aspect of the agreement that makes it illusory and unenforceable.  This Court has held that "a unilateral change-in-terms provision, *by itself*, *with no other elements of unconscionability*" is not sufficient to "render an agreement unenforceable."  *Ekin v. Amazon Servs.*, 2015 U.S. Dist. LEXIS 16832, *7-8 (W.D. Wash. Feb. 10, 2015) (citations omitted) (emphasis in original).  Here, as discussed above, the ability to unilaterally change the terms of the SSA, combined with the status of users as minors, the procedural and substantive unconscionability discussed above, and Valve's refusal to enforce the SSA against Skins Gambling websites until Plaintiffs first brought these claims, is sufficient to meet the standard this Court set out in *Ekin*.

Indeed, Exhibit H to the Boyd Declaration, which includes all applicable versions of the SSA, includes 13 versions of the SSA and spans some 134 pages.  Such constant unilateral

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 29

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

updates involving a contract that Valve seeks to enforce against users thirteen years and older show the SSA is illusory and cannot be enforced against Plaintiffs. *See also Meyer v. Kalanick*, --- F.Supp.3d ----, 2016 WL 4073012 (S.D.N.Y. July 29, 2016) (attached as Exhibit 2).  Valve's conduct shows that its ability to make unilateral changes, combined with the unconscionable terms and selective enforcement, makes the SSA an illusory contract that is unenforceable against Plaintiffs.

## V.  CONCLUSION

Valve has not met its burden to show that the arbitration clause in the SSA is an enforceable contract against Plaintiffs.  The SSA specifically exempts the claims that Plaintiffs brought, and, because Valve knowingly entered into a contract with minors (a contract that Valve did not follow when facilitating the actions of Skins Gambling websites that violated its SSA, Valve cannot now enforce its arbitration clause against Plaintiffs.  To do so would allow Valve to turn back on the spigot of profits from Skins Gambling and not allow Plaintiffs to stop it.  Such a result would be unconscionable, against the terms of the SSA itself, and contrary to Washington and Ninth Circuit law.  Accordingly and respectfully, this Court should deny Valve's Motion.

DATED this 19th day of September, 2016.

By: */s/ Kim D. Stephens*
By: */s/ Jason T. Dennett*
    Kim D. Stephens, P.S., WSBA #11984
    Email: KStephens@tousley.com
    Jason T. Dennett, WSBA #30686
    Email:  jdennett@tousley.com
    **TOUSLEY BRAIN STEPHENS PLLC**
    1700 Seventh Avenue, Suite 2200
    Seattle, WA 98101
    Tel:  (206) 682-5600
    Fax: (206) 682-2992

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 30

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Jasper D. Ward IV (*admitted pro hac vice*)
Alex C. Davis
Patrick Walsh
**JONES WARD PLC**
Marion E. Taylor Building
312 S. Fourth Street, Sixth Floor
Louisville, Kentucky 40202
Tel. (502) 882-6000
Fax (502) 587-2007
jasper@jonesward.com
alex@jonesward.com
patrick@jonesward.com

Paul C. Whalen (PW1300)
**LAW OFFICE OF PAUL C. WHALEN, P.C.**
768 Plandome Road
Manhasset, NY 11030
Tel. (516) 426-6870
Fax (212) 658-9685
pcwhalen@gmail.com

D. Todd Mathews, 163104
**Gori Julian & Associates, P.C.**
Attorneys at Law
156 N. Main St.
Edwardsville, IL  62025
Tel. (618) 659-9833
Fax (618) 659-9834
todd@gorijulianlaw.com

Neal L. Moskow, Esq.
Fed. Bar. No. CT 04516
**Ury & Moskow, L.L.C.**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone (203) 610-6393
Facsimile: (203) 610-6399
neal@urymoskow.com

John A. Yanchunis, FBN: 0324681
**MORGAN & MORGAN**
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
jyanchunis@forthepeople.com

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

Kevin S. Hannon
**The Hannon Law Firm, LLC**
1641 Downing Street
Denver, Colorado 80218
303-861-8800
khannon@hannonlaw.com
www.hannonlaw.com

Melissa R. Emert
Patrick K. Slyne
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY 10017
Tel. (212) 687-7230
Fax (212) 490-2022
memert@ssbny.com
pkslyne@ssbny.com

Corey D. Sullivan
**SULLIVAN LAW LLC**
1814 E Eagle Bay Drive
Bloomington, IN 47401
corey@druginjurylegal.com
Phone: (314) 971-9353

Casey Flynn
**Law Office of Francis J. Flynn, Jr.**
6220 West Third Street, #415
Los Angeles, CA 90036
francisflynn@gmail.com

Andrew P. Bell
Alfred M. Anthony
James A. Barry
**LOCKS LAW FIRM LLC**
801 N. Kings Highway
Cherry Hill, NJ 08034
Tel: (856)663-8200
Fax: (856)661-8400
abell@lockslaw.com
aanthony@lockslaw.com
jbarry@lockslaw.com

JEAN SUTTON MARTIN
North Carolina Bar Number 25703
**Law Office of Jean Sutton Martin PLLC**
2018 Eastwood Road Suite 225
Wilmington, NC 28403
Telephone: (910) 292-6676
Email: jean@jsmlawoffice.com

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 32

1  Diandra "Fu" Debrosse Zimmermann
   **ZARZAUR MUJUMDAR DEBROSSE**
2  2332 2nd Avenue North
   Birmingham, Alabama 35203
3  Telephone: (205) 983-7985
   fuli@zarzaur.com
4  www.zarzaur.com

5  Anthony S. Bruning
   Anthony S. Bruning Jr.
6  Ryan Bruning
   **THE BRUNING LAW FIRM**
7  555 Washington Ave, Suite 600
   St. Louis, MO 63101
8  Tel: (314) 735-8100
   Fax: (314) 735-8020
9  tony@bruninglegal.com
   aj@bruninglegal.com
10 ryan@bruninglegal.com

11 Richard S. Cornfeld
   **LAW OFFICE OF RICHARD S.**
   **CORNFELD**
12 1010 Market Street, Suite 1720
   St. Louis, MO 63101
13 Tel: (314) 241-5799
   Fax: (314) 241-5788
14 rcornfeld@cornfeldlegal.com

15 Robert Ahdoot
   Tina Wolfson
16 **AHDOOT & WOLFSON, PC**
   1016 Palm Avenue
17 West Hollywood, California 90069
   Tel: (310) 474-9111
18 Fax: (310) 474-8585
   rahdoot@ahdootwolfson.com
19 twolfson@ahdootwolfson.com

20 Hunter J. Shkolnik
   Salvatore C. Badala
21 **NAPOLI SHKOLNIK PLLC**
   1301 Avenue of the Americas, 10th Floor
22 New York, New York 10019
   (212) 397-1000
23 hunter@napolilaw.com
   SBadala@napolilaw.com
24

25

26

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 33

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Daniel C. Girard
Adam E. Polk
Jordan Elias
Esfand Y. Nafisi
Simon S. Grille
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94108
Tel: (415) 981-4800
sg@girardgibbs.com
aep@girardgibbs.com
eyn@girardgibbs.com
je@girardgibbs.com
dcg@girardgibbs.com

*Attorneys for Plaintiffs and the Class*

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 34

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

DATED at Seattle, Washington, this 19th day of September, 2016.

By: */s/ Kim D. Stephens*
      Kim D. Stephens, P. S., WSBA #11984
      Email: KStephens@tousley.com
      **TOUSLEY BRAIN STEPHENS PLLC**
      1700 Seventh Avenue, Suite 2200
      Seattle, WA 98101
      Tel:  (206) 682-5600
      Fax: (206) 682-2992

6225/001/357413.1

PLAINTIFFS' RESPONSE TO DEFENDANT VALVE
CORPORATION'S MOTION TO COMPEL ARBITRATION
(16-cv-01227) - 35

# Exhibit 1

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  SACV 16-44-JLS (KESx)                    Date: August 5, 2016
Title:  Beau Briones v. Fitness International, LLC et al.

Present: **Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

  Terry Guerrero                                               N/A    
  Deputy Clerk                                          Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFF:   ATTORNEYS PRESENT FOR DEFENDANT:
  Not Present                                           Not Present

**PROCEEDINGS:   (IN CHAMBERS) ORDER DENYING DEFENDANT'S
MOTION TO COMPEL ARBITRATION (Doc. 9)**

Before the Court is a Motion to Compel Arbitration filed by Defendants Fitness &
Sports Clubs, LLC and Fitness International, LLC.  (Mot., Doc. 9.)  Plaintiff Beau
Briones opposed, and Defendants replied.  (Opp., Doc. 12; Reply, Doc. 13.)  Having read
and considered the parties' briefs, heard oral argument, and taken the matter under
submission, the Court DENIES Defendants' Motion.

## I.   BACKGROUND

Defendants Fitness International, LLC and Fitness & Sports Clubs, LLC (together
"Fitness") operate over 650 gyms and health clubs in at least 30 states, including a fitness
club located in Long Beach, California.  (Pham Decl. ¶¶ 1, 3, Doc. 9-2.)  Fitness & Sports
is a wholly-owned subsidiary of Fitness International.  (*Id*. ¶ 2.)  As part of its regular
course of business, Fitness enters into membership agreements with each of its members,
and it enters into Personal Training Agreements ("PTA") with members who enroll in
personal training programs.  (*Id*. ¶ 4.)  To enter into the above agreements, Long Beach
club members sign an electronic signature device and have their signatures and/or initials
transposed to the agreements.  (Mallonee Decl. ¶¶ 4-9, Doc. 9-7; Bryant Decl. ¶¶ 4-11,
Doc. 9-6.)  According to the Long Beach club's standard procedure, employees are
allegedly trained to (1) first review the agreement terms with the member on a computer

---

___

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  SACV 16-44-JLS (KESx)                    Date: August 5, 2016
Title:  Beau Briones v. Fitness International, LLC et al.

monitor facing the member, (2) obtain signatures or initials where indicated on the agreement, and (3) provide a printed copy of the signed agreement to the member.  (*Id*.) Fitness also states that from May 2013 to November 2014, the electronic signature devices at the Long Beach club had a sticker that stated: "Review Agreement Before Signing; by Electronically Signing You Agree to All of its Terms.  You are Entitled to a Copy.  If You Do Not Receive One, Call 949-255-7200."  (Bryant Decl. ¶ 12; Suppl. Bryant Decl. ¶ 3, Doc. 13-1; Suppl. Bryant Decl. Ex. F, Doc. 13-2.)

On May 19, 2013, Plaintiff Beau Briones signed an electronic signature device to enter into a membership agreement with Defendant Fitness & Sports Clubs, LLC at its Long Beach club.  (Pham Decl. ¶ 5, Ex. A, Doc. 9-3.)  On December 3, 2013, Plaintiff signed an electronic signature device to enter into a one-year PTA.  (Pham Decl. ¶ 5, Ex. B, Doc. 9-4.)  In November 2014, after the one-year PTA expired, Plaintiff indicated he did not wish to renew or continue the agreement.  (Briones Decl. ¶ 4, Doc. 12-1.) Plaintiff asserts he then agreed to a one-month extension of his PTA for $140, the same monthly price he was previously charged under the PTA.  (*Id*. ¶ 5.)  Plaintiff signed the electronic signature device and the next day, provided $140 to cover the cost of the one-month extension.  (*Id*. ¶¶ 6, 8.)  Plaintiff later learned that Fitness had electronically debited his bank account for an additional $110.  (*Id*. ¶ 9.)  When he contacted Fitness to dispute the withdrawal, Plaintiff saw a copy of a 2014 PTA with his transposed signature that agreed to a 52 week contract period at a cost of $110 per month.  (*Id*. ¶ 11.)

Fitness asserts, and Plaintiff does not dispute, that Plaintiff was emailed a copy of the membership agreement and both PTAs the same day he provided his electronic signatures.  (Mallonee Decl. ¶¶ 11, 14; Bryant Decl. ¶¶ 14, 18.)  However, as for the 2014 PTA, Plaintiff states he "was never presented with the agreement prior to signing, the electronic device contained no information about the agreement, and a copy . . . was never printed and given to [him] after signing."  (Briones Decl. ¶ 7.)  Plaintiff also asserts that the electronic signature device "had no writing on it pertaining to any agreement that [he] was being asked to sign," and that he "was not informed to go elsewhere to review any terms and conditions of the agreement he entered into . . . ."  (*Id*. ¶ 6.)  He indicates he was "never informed, in writing or verbally, prior to signing, that the agreement [he]

___

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  SACV 16-44-JLS (KESx)                    Date: August 5, 2016
Title:  Beau Briones v. Fitness International, LLC et al.

was signing on the tablet device would contain an arbitration clause."  (*Id*. ¶ 11.)  Finally, Plaintiff states that Fitness followed "the same practice and procedure for collecting [his] signature and applying it to the 2013 [PTA] and the original membership agreement." (*Id*. ¶ 13.)

Fitness provided to the Court copies of the membership agreement, 2013 PTA, and 2014 PTA that contain Plaintiff's transposed signatures and initials.  (Pham Decl. Exs. A-C.)  The membership agreement and both PTAs include an arbitration clause.  (Pham Ex. A at 4, Ex. B at 7, Ex. C at 10.)  The agreements provide in relevant part:

> In the event of any dispute . . . between you and [Fitness] . . . you and [Fitness] consent to arbitrate that dispute before a single arbitrator under the then current rules of the American Arbitration Association in a location near your [Fitness] club, rather than litigate the dispute in court.

(*Id*.)  The arbitration clause also provides the following delegation provision:

> If [Fitness] is a party to the proceeding, the arbitrator shall interpret and determine the validity of the arbitration provision, including unconscionability.  If the arbitrator finds that the arbitration agreement, including the class waiver, is unenforceable, in whole or I part, the entire arbitration provision shall be null and void and either party may file the action in court.

(*Id*.)  On January 12, 2016, Plaintiff filed a putative class action complaint against Fitness alleging the following claims: (1) unfair competition, Cal. Bus. & Prof. Code § 17500 *et seq*., (2) unfair competition, Cal. Bus. & Prof. Code § 17200 *et seq.*, (3) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq*., (4) violation of the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq*., (5) violation of the Health Studio Services Contract Act, Cal. Civ. Code § 1812.80 *et seq*., (6) conversion, and (7) violation of the Financial Elder Abuse Act, Cal. Welf. & Inst. Code § 15610.30.

—————————————————————————————————

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  SACV 16-44-JLS (KESx)                    Date: August 5, 2016

Title:  Beau Briones v. Fitness International, LLC et al.

—————————————————————————————————

(Compl. ¶¶ 84-144, Doc. 1.)  Fitness[1] now moves to compel arbitration of Plaintiff's claims.

## II.   **LEGAL STANDARD**

Congress enacted the Federal Arbitration Act "in 1925 as a response to judicial hostility to arbitration."  *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 668 (2012). The FAA provides that an agreement to arbitrate disputes arising from "a contract evidencing a transaction involving commerce" shall be "valid, irrevocable, and enforceable."  9 U.S.C. § 2.  "The court's role under the Act is . . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Chiron Corp. v. Ortho Diagnostic Sys., Inc*., 207 F.3d 1126, 1130 (9th Cir. 2000).  The "party seeking to compel arbitration has the burden under the FAA to show [these two elements]."  *Ashbey v. Archstone Property Mgmt., Inc*., 785 F.3d 1320, 1323 (9th Cir. 2015).  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp.*

————————————

[1] Fitness International LLC was not a party to the membership agreement or the PTAs. District courts in the Ninth Circuit have established a two-prong standard for determining when a nonsignatory defendant can compel arbitration of a signatory plaintiff's claim: (1) the subject matter of the dispute must be "intertwined with the contract providing for arbitration" and (2) there must be a "close relationship" between a signatory party and the nonsignatory party seeking to compel arbitration.  *In re Apple & AT & TM Antitrust Litig*., 826 F. Supp. 2d 1168, 1176-78 (N.D. Cal. 2011) (citing *Mundi v. Union Sec. Life Ins. Co*., 555 F.3d 1042, 1046 (9th Cir. 2009)).  "[S]ubsidiaries, affiliates, agents, and other related business entities" have been deemed to satisfy the "close relationship" prong of this inquiry.  *See T-Mobile USA, Inc. v. Montijo*, No. C12-1317 RSM, 2012 WL 6194204, at *3 (W.D. Wash. Dec. 11, 2012) (collecting cases).  Here, Plaintiff's claims are fundamentally intertwined with the 2014 PTA and Fitness' alleged practice of misleading members into entering such agreements, (*see* Compl.), and Fitness & Sports Clubs is a wholly-owned subsidiary of Fitness International, (Pham Decl. ¶ 2). Moreover, Plaintiff failed to raise any objection or argument against Defendants' assertion that Fitness International could move to compel arbitration under this standard.

—————————————————————————————————

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  SACV 16-44-JLS (KESx)                    Date: August 5, 2016
Title:  Beau Briones v. Fitness International, LLC et al.

*v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983), *superseded by statute on other grounds*.  However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)).  Arbitration agreements may also "be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'"  *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1746 (2011) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

In these analyses, a court may consider evidence outside of the pleadings, such as declarations and other documents filed with the court, using "a standard similar to the summary judgment standard of [Federal Rule of Civil Procedure 56]."  *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004); *see also Hadlock v. Norwegian Cruise Line, Ltd.*, No. 10-0187-AG (ANx), 2010 WL 1641275, at *1 (C.D. Cal. Apr. 19, 2010); *Geographic Expeditions, Inc. v. Estate of Lhotka ex rel. Lhotka*, 599 F.3d 1102, 1104 n.1 (9th Cir. 2010) ("We take . . . facts from the First Amended Complaint, on file in the district court, and declarations filed in support of and in opposition to the motion to dismiss.  All are part of our record.").

## III.   DISCUSSION

### A.   Agreement to Arbitrate

"The threshold issue in deciding a motion to compel arbitration is 'whether the parties agreed to arbitrate.'"  *Quevedo v. Macy's, Inc.*, 798 F. Supp. 2d 1122, 1133 (C.D. Cal. 2011) (quoting *Van Ness Townhouses v. Mar. Indus. Corp.*, 862 F.2d 754, 756 (9th Cir. 1988)).  "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (alteration in original) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)).  "When determining whether a valid contract to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  SACV 16-44-JLS (KESx)                    Date: August 5, 2016
Title:  Beau Briones v. Fitness International, LLC et al.

arbitrate exists, we apply ordinary state law principles that govern contract formation."
*Davis v. Nordstrom, Inc*., 755 F.3d 1089, 1093 (9th Cir. 2014) (citing *Ferguson v. Countrywide Credit Indus., Inc*., 298 F.3d 778, 782 (9th Cir. 2002)).  "It is undisputed that under California law,[2] mutual assent is a required element of contract formation." *Knutson*, 771 F.3d at 565.  "This principle of knowing consent applies with particular force to provisions for arbitration."  *Id*. at 566 (quoting *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (1972)).  Thus, "[a]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware[.]"  *Id*.  "[T]he party seeking to compel arbitration[] has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence."  *Id*. at 565 (citing *Rosenthal v. Great W. Fin. Sec. Corp*., 14 Cal. 4th 394, 413 (1996)).

Here, Plaintiff argues that because he was not informed of or presented with the agreements when he provided his signatures, he never agreed to arbitrate.  (Opp. at 9-13.) Defendants posit this issue should be reserved for the arbitrator pursuant to the agreements' delegation clause, whereby "the arbitrator shall interpret and determine the validity of the arbitration provision, including unconscionability." (Reply at 3.) However, the above delegated issue of validity pertains to "whether [the arbitration agreement] is legally binding, as opposed to *whether it was in fact agreed to*."  *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010) (emphasis added).  The latter question remains a threshold issue for this Court to decide.  Accordingly, in this Order, the Court addresses whether Fitness sufficiently establishes an agreement to arbitrate. For the following reasons, the Court finds that Fitness fails to satisfy its burden of establishing this agreement.

First, Fitness argues that Plaintiff "was shown each Agreement before signing." (Reply at 5.)  However, its evidence reflects only that the Long Beach club encouraged a general practice of reviewing agreement terms with a member before obtaining the member's signature.  (*See* Bryant Decl. ¶¶ 6-18, Mallonee Decl. ¶¶ 5-13.)  Fitness

---

[2] Neither party disputes that California law applies in this case.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  SACV 16-44-JLS (KESx)                    Date: August 5, 2016
Title:  Beau Briones v. Fitness International, LLC et al.

supervisors state that upon reviewing Briones' membership agreement and PTAs, they believe the agreements were "completed in a manner consistent with the procedure [they] teach."  (Bryant Decl. ¶ 18; Mallonee Decl. ¶ 14.)  As to the PTAs, Fitness argues that Plaintiff provided his signature or initials seven times for each agreement, which "is consistent with the company's practice of reviewing each section in which a signature or initial was required."  (Reply at 5.)  However, Plaintiff expressly states he was never presented with the agreements before he provided his signatures, nor was he informed— either verbally or in writing—that the agreements contained an arbitration clause. (Briones Decl. ¶¶ 11, 13, 15.)  In light of this clear declaration, Fitness' broad assertions as to its general practice fail to demonstrate that Plaintiff saw each agreement before signing.  Accordingly, without evidence that Plaintiff saw or was aware of the arbitration provision before signing, Fitness fails to demonstrate an agreement to arbitrate.

Second, Fitness asserts that the stickers on the electronic signature devices expressly informed Plaintiff that he consented to all agreement terms when he provided his signature.  Plaintiff challenges this assertion; he states that when he provided his signatures, the device he signed had no writing that "pertained to any agreement [he] was being asked to sign" or "informed [him] to go elsewhere to review any terms and conditions of the agreement [he] entered into."  (Briones Decl. ¶¶ 6, 13.)  However, even if the Court assumes the presence of these stickers at the time of Plaintiff's signing, Fitness fails to establish an agreement to arbitrate.

It is undisputed that the device on which Plaintiff placed his signature did not display any terms of the purported agreements.  Thus, at most, Fitness can argue the stickers provide notice that the signee agrees to terms contained elsewhere.  Fitness does not provide convincing authority that the presence of these stickers are sufficient, on their own, to create a contract under California law.  The closest analogy found by the Court is California's "incorporation by reference" doctrine, which provides that "parties may validly incorporate by reference into their contract the terms of another document." *Lucas v. Hertz Corp.*, 875 F. Supp. 2d 991, 998 (N.D. Cal. 2012) (quoting *Slaught v. Bencomo Roofing Co.*, 25 Cal. App. 4th 744, 748 (1994)).  When the Court identified this doctrine at the hearing, Plaintiff argued the doctrine supported his assertion that he did

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  SACV 16-44-JLS (KESx)                    Date: August 5, 2016

Title:  Beau Briones v. Fitness International, LLC et al.

not manifest any agreement to the unseen arbitration terms.  For the following reasons, the Court agrees.

"For the terms of another document to be incorporated into the document executed by the parties, (1) the reference must be clear and unequivocal, (2) the reference must be called to the attention of the other party and he must consent thereto, and (3) the terms of the incorporated document must be known or easily available to the contracting parties." *Id*. (quoting *Shaw v. Regents of Univ. of Cal*., 58 Cal. App. 4th 44, 54 (1997)).  Here, the stickers broadly reference an "Agreement," and they inform the member that he "agree[s] to all of its terms" by providing an electronic signature.  It is therefore arguable that condition (2) was met:  the stickers called to the attention of the signee that he was agreeing to terms of an agreement that may not be before him, and the signee consented by signing the device.  Fatally, however, the reference is not clear or unequivocal; it is ambiguous at best.  Because the stickers do not identify any agreement by name, they fail to give notice of *which* agreement the member agrees to when providing his signature.  In light of the fact that Fitness appears to use this device to place signatures on several different agreements, the reference is anything but clear.  Thus, the stickers fail to clearly "guide the reader to the [relevant] incorporated document."  *See Shaw*, 58 Cal. App. 4th at 54.  Moreover, the Court notes that the stickers do not seek to incorporate *additional* terms to an agreement; the stickers seek to incorporate the terms of the *entire agreement*. Fitness fails to provide any legal authority that this type of incorporation is permissible or even contemplated under California's "incorporation by reference" doctrine.

Fitness also argues that Plaintiff's signatures and initials are analogous to "I agree" buttons on clickwrap agreements, whereby an online user "clicks on an 'I agree' box after being presented with a list of terms and conditions of use."  (Reply at 4-5 (quoting *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014))).  Although Plaintiff states he was never presented with the agreement terms, we note that courts have upheld modified clickwrap contracts where users are prompted to examine agreement terms located elsewhere, such as documents or webpages made accessible by hyperlinks in close proximity to the "I accept" button.  *See Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011); *Mohamed v. Uber Techs., Inc.*, 109 F. Supp.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.  SACV 16-44-JLS (KESx)                    Date: August 5, 2016

Title:  Beau Briones v. Fitness International, LLC et al.

3d 1185, 1190-91, 1195-97 (N.D. Cal. 2015).  Superficially, the purported agreements at issue here may appear like modified clickwrap agreements.  However, material differences distinguish the facts of this case from clickwrap agreements that have been upheld in this circuit.  In such cases, the "I accept" button is generally preceded by a statement that the user agrees to certain *specified* agreements, and a hyperlink provides a direct and immediate opportunity to review the specified terms before providing assent.  *See Swift*, 805 F. Supp. 2d at 907-08, 911-12; *Mohamed*, 109 F. Supp. 3d at 1190-91, 1195-97.  These considerations are absent here, where the stickers fail to identify any specific agreements by name and the member is not provided a direct and immediate opportunity to review the agreement terms before signing the device.  Thus, even assuming the presence of the stickers on the devices at the time of signing, there is *no* indication of what agreement or what agreement terms are purportedly made binding on the member.

This Court has already held that, in the context of browsewrap agreements, online users are not bound to hyperlinked terms that are positioned where the terms are unlikely to be seen or noticed.  *Nguyen v. Barnes & Noble, Inc*., No. 8:12-cv-0812-JST (RNBx), 2012 WL 3711081, at *3-4 (C.D. Cal. Aug. 28, 2012), *affirmed*, 763 F.3d 1171 (9th Cir. 2014).  Here, Fitness seeks to bind Plaintiff to unseen and unnoticed terms that were *never* identified with specificity or provided by the device at the time of signing.  Fitness fails to provide any convincing authority to support this assertion, and the Court declines to so hold.  Accordingly, even if the Court assumes the stickers were present when Plaintiff provided his signatures, Fitness fails to demonstrate that Plaintiff manifested an agreement to arbitrate.

Finally, Fitness asserts that Plaintiff was sent email copies of the agreements after he provided his signatures.  (Mem. at 7, Doc. 9-1; Reply at 5-6.)  Fitness argues that upon receiving email copies for three agreements on three different occasions, "Plaintiff cannot honestly claim that he did not know he entered into each Agreement with Fitness."  (Reply at 6.)  However, Fitness fails to argue or provide any legal authority that the post-signature delivery of copies of an agreement, by itself, binds an individual to un-viewed

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  SACV 16-44-JLS (KESx)                    Date: August 5, 2016

Title:  Beau Briones v. Fitness International, LLC et al.

---

and unacknowledged arbitration terms.  Accordingly, the email copies sent *after* each
Agreement provide no indication that Plaintiff, *at the time of signing*, agreed to arbitrate.

At the hearing, Fitness emphasized that the email copies indicate Plaintiff had
access to the agreement terms—including the arbitration provision—*before* he provided
his signature for the disputed 2014 PTA.  Plaintiff asserts he never entered into the 2014
PTA and that when he provided his electronic signature in November 2014, he believed
he was entering into a one-month extension of his 2013 PTA.  (Briones Decl. ¶¶ 4-8.)
Plaintiff does not dispute he was emailed a copy of the 2013 PTA on December 3, 2013.
(*See* Meghdadi Decl. ¶ 7.)  However, the email to which a copy of the agreement was
purportedly attached was entitled "Purchase Confirmation."  (*Id*.)  It is well established
that "an offeree, regardless of apparent manifestation of his consent, is not bound by
inconspicuous contractual provisions of which he was unaware, contained in a document
whose contractual nature is not obvious."  *Windsor Mills, Inc. v. Collins & Aikman Corp*.,
25 Cal. App. 3d 987, 993 (1972) (citations omitted).  The email heading does not provide
notice of an agreement to arbitrate, nor does it indicate that the email contains notice of a
binding arbitration provision.  Fitness does not present any evidence that the content of
the email conveyed the essential arbitration terms or provided notice of the arbitration
clause in the attached agreement.  Accordingly, Fitness fails to satisfy its burden of
demonstrating that the email adequately notified Plaintiff of the relevant arbitration
terms.  *See Campbell v. General Dynamics Gov't Sys. Corp*., 407 F.3d 546, 557-58 (1st
Cir. 2005) (holding that a company-wide email announcement regarding the
implementation of a new dispute resolution policy failed to put recipients on notice of the
binding arbitration clause contained in the linked materials, which rendered the
arbitration agreement unenforceable); *Hudyka v. Sunoco, Inc*., 474 F. Supp. 2d 712, 716-
17 (E.D. Pa. 2007) (finding that an email could not bind the recipient to a binding
arbitration provision where it failed to notify the recipient of the essential terms of the
provision).

Accordingly, in light of all the above considerations, Fitness fails to demonstrate
by a preponderance of the evidence that Plaintiff agreed to arbitrate.  Where the moving

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  SACV 16-44-JLS (KESx)                    Date: August 5, 2016

Title:  Beau Briones v. Fitness International, LLC et al.

party fails to adequately establish an agreement to arbitrate, the Court cannot compel arbitration.  *See Knutson*, 771 F.3d at 569.  Accordingly, the Court DENIES the Motion.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES Defendants' Motion to Compel Arbitration.[3]

Initials of Preparer:  tg

_____

[3] Fitness also seeks judicial notice of Rule 7 of the AAA's Commercial Arbitration Rules as well as pages 8 and 14 of the AAA's Consumer-Related Disputes Supplementary Procedures. (RJN at 1, Doc. 10.)  Fitness uses Rule 7 to support its argument that the delegation clause clearly and unequivocally delegates certain matters to the arbitrator, and Fitness uses the latter pages to support their argument that the arbitration agreement is not unconscionable.  Given the Court's denial of the Motion on other grounds, the Court denies the request for judicial notice as moot.

# Exhibit 2

Meyer v. Kalanick, --- F.Supp.3d ---- (2016)

2016 WL 4073012, 2016-2 Trade Cases P 79,721

KeyCite Yellow Flag - Negative Treatment

Distinguished by Bekele v. Lyft, Inc., D.Mass., August 9, 2016

2016 WL 4073012
United States District Court,
S.D. New York.

Spencer Meyer, individually and on behalf of those
similarly situated, Plaintiff,
v.
Travis Kalanick and Uber Technologies, Inc.,
Defendants.

15 Civ. 9796
|
Signed 07/29/2016

**Synopsis**
**Background:** Consumer filed putative class action alleging antitrust claims against company that set prices for consumers to use transportation services which were prearranged online and against the transportation service provider. Defendants moved to compel arbitration.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

[1] California law, rather than New York law, applied to determination of whether valid arbitration agreement existed, and

[2] consumer did not enter into valid agreement to arbitrate.

Motion denied.

West Headnotes (11)

[1]    **Jury**
       ⚖Form and sufficiency of waiver
       **Jury**
       ⚖Evidence of waiver

       The fundamental right to a jury trial can be waived only if the waiver is knowing and voluntary, with the courts indulging every

reasonable presumption against waiver. U.S. Const. Amend. 7.

Cases that cite this headnote

[2]    **Alternative Dispute Resolution**
       ⚖Existence and validity of agreement

       The question of whether an arbitration agreement existed is for the court and not an arbitrator to decide.

Cases that cite this headnote

[3]    **Alternative Dispute Resolution**
       ⚖What law governs

       Under New York choice-of-law rules, California law, rather than New York law, applied to determination of whether user agreement between consumers and provider of prearranged online transportation services contained valid arbitration agreement; provider, which was drafter of agreement, was located in California, and arbitration provision indicated that the arbitrator would either be a retired judge or attorney licensed to practice in California.

Cases that cite this headnote

[4]    **Contracts**
       ⚖What law governs

       New York's "interest analysis" for deciding which state law to apply in interpreting a contract requires the court to consider five factors: (1) the place of contracting; (2) the place of the contract negotiations; (3) the place of the performance of the contract; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, places of incorporation, and places of business

of the parties.

Cases that cite this headnote

[5]     **Alternative Dispute Resolution**
        ⟜In general; formation of agreement

        Under California law, consumer did not enter
        into valid agreement to arbitrate putative
        antitrust action against company that set prices
        for consumers to use online prearranged
        transportation service or against transportation
        service provider by registering to use service via
        the provider's mobile phone application;
        registering required consumer to acknowledge
        his agreement to the terms of service, which
        included arbitration agreement, by clicking
        button, but did not necessarily require consumer
        to click on hyperlink to display terms of service,
        consumer could complete registration process
        and access the transportation service without
        ever displaying terms, provider's notification
        that terms were only available by clicking on
        hyperlink in font barely legible on mobile
        phone application and was otherwise not
        conspicuous in relation to other information on
        registration screen, and there was no showing
        that consumer actually displayed the terms of
        use or repeatedly visited registration screen.

        Cases that cite this headnote

[6]     **Copyrights and Intellectual Property**
        ⟜Contracts

        Under California law, an individual may be said
        to have assented to an online electronic
        agreement without clicking on a hyperlink to
        open the agreement or otherwise displaying the
        agreement if a reasonably prudent user would
        have been put on inquiry notice of the terms of
        the contract.

        Cases that cite this headnote

[7]     **Copyrights and Intellectual Property**
        ⟜Contracts

        Under California law, "clickwrap" online
        agreements, in which website users are required
        to click on an "I agree" box after being
        presented with a list of terms and conditions of
        use, are more readily enforceable, since they
        permit courts to infer that the user was at least
        on inquiry notice of the terms of the agreement,
        and has outwardly manifested consent by
        clicking a box; however, "browsewrap"
        agreements, in which a website's terms and
        conditions of use are posted via a hyperlink at
        the bottom of the screen and user can continue
        to use the website or its services without visiting
        the page hosting the agreement or even knowing
        that such a webpage exists, are generally
        enforced only if it can be ascertained that a user
        had actual or constructive knowledge of the
        website's terms and conditions, and manifested
        assent to them.

        Cases that cite this headnote

[8]     **Contracts**
        ⟜Necessity of assent

        Under California law, mutual manifestation of
        assent is the touchstone of a contract.

        Cases that cite this headnote

[9]     **Alternative Dispute Resolution**
        ⟜In general; formation of agreement
        **Alternative Dispute Resolution**
        ⟜Validity

        Under California law, arbitration agreements are
        no exception to the requirement of mutual
        manifestation of assent to form a valid contract,
        and conspicuousness of arbitration terms are
        important in securing informed assent.

        Cases that cite this headnote

Meyer v. Kalanick, --- F.Supp.3d ---- (2016)

2016 WL 4073012, 2016-2 Trade Cases P 79,721

OPINION AND ORDER

**[10]   Copyrights and Intellectual Property**
⟜Contracts

Under California law, courts determining the validity of online agreements must embark on a fact-intensive inquiry in order to make determinations about the existence of reasonably conspicuous notice of the agreement in any given case.

Cases that cite this headnote

**[11]   Alternative Dispute Resolution**
⟜Contractual or consensual basis

The Federal Arbitration Act does not require parties to arbitrate when they have not agreed to do so. 9 U.S.C.A. § 1 et seq.

Cases that cite this headnote

**Attorneys and Law Firms**

John Christopher Briody, James Hartmann Smith, McKool Smith, Matthew L. Cantor, David Alan Scupp, Constantine Cannon, LLP, New York, NY, Bryan Lee Clobes, Cafferty Faucher LLP, Ellen Meriwether, Miller Faucher & Cafferty, LLP, Philadelphia, PA, Brian Marc Feldman, Edwin Michael Larkin, III, Jeffrey A. Wadsworth, Harter, Secrest & Emery, LLP, Rochester, NY, Lewis Titus LeClair, McKool Smith, P.C., Dallas, TX, Andrew Arthur Schmidt, Andrew Schmidt Law PLLC, Portland, ME, for Plaintiff Spencer Meyer.

Peter M. Skinner, Alanna Cyreeta Rutherford, Joanna Christine Wright, Boies, Schiller & Flexner LLP, New York, NY, Ryan Young Park, William A. Isaacson, Karen L. Dunn, Boies, Schiller & Flexner LLP, Washington, DC, for Defendant, Travis Kalanick.

Reed Michael Brodsky, Gibson, Dunn & Crutcher, LLP, New York, NY, for Uber Technologies, Inc.

JED S. RAKOFF, U.S.D.J.

**\*1 [1]**Since the late eighteenth century, the Constitution of the United States and the constitutions or laws of the several states have guaranteed U.S. citizens the right to a jury trial. This most precious and fundamental right can be waived only if the waiver is knowing and voluntary, with the courts "indulg[ing] every reasonable presumption against waiver." Aetna Ins. Co. v. Kennedy to Use of Bogash, 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177 (1937); Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 188 (2d Cir.2007). But in the world of the Internet, ordinary consumers are deemed to have regularly waived this right, and, indeed, to have given up their access to the courts altogether, because they supposedly agreed to lengthy "terms and conditions" that they had no realistic power to negotiate or contest and often were not even aware of.

This legal fiction is sometimes justified, at least where mandatory arbitration is concerned, by reference to the "liberal federal policy favoring arbitration," AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011) (internal quotation marks omitted). Application of this policy to the Internet is said to inhere in the Federal Arbitration Act, as if the Congress that enacted that Act in 1925 remotely contemplated the vicissitudes of the World Wide Web. Nevertheless, in this brave new world, consumers are routinely forced to waive their constitutional right to a jury and their easy access to courts, and to submit instead to arbitration, on the theory that they have voluntarily agreed to do so in response to endless, turgid, often impenetrable sets of terms and conditions, to which, by pressing a button, they have indicated their agreement.

But what about situations where the consumer is not even asked to affirmatively indicate her consent? What about situations in which the consumer, by the mere act of accessing a service, is allegedly consenting to an entire lengthy set of terms and conditions? And what about the situation where the only indication to the consumer that she is so consenting appears in print so small that an ordinary consumer, if she could read it at all, would hardly notice it? Writing for the Second Circuit Court of Appeals in 2002, then-Circuit Judge Sonia Sotomayor presciently held that "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." Specht v. Netscape Communications Corp., 306 F.3d 17, 35 (2002). Applying these principles to the

Meyer v. Kalanick, --- F.Supp.3d ---- (2016)

2016 WL 4073012, 2016-2 Trade Cases P 79,721

matter at hand, the Court finds that the plaintiff here never agreed to waive his right to a jury trial or to submit to mandatory arbitration.

The background of this case is set forth in prior written decisions of this Court, familiarity with which is here assumed. See Opinion and Order dated March 31, 2016, Dkt. 37; Opinion and Order dated May 7, 2016, Dkt. 44; Memorandum Order dated June 19, 2016, Dkt. 90. By way of brief background, on December 16, 2015, plaintiff Spencer Meyer filed suit against defendant Travis Kalanick, alleging that Mr. Kalanick had orchestrated and participated in an antitrust conspiracy arising from the algorithm that co-defendant Uber Technologies, Inc. ("Uber") uses to set ride prices. See Complaint, Dkt. 1. Mr. Kalanick did not, at that time, make any motion to compel arbitration. Instead, he filed a motion to dismiss plaintiff's First Amended Complaint, which was denied on March 31, 2016, as well as a motion to reconsider the Court's determination that plaintiff could seek to proceed via class action, which was denied on May 9, 2016. See Opinion and Order dated March 31, 2016; Opinion and Order dated May 7, 2016. Following these Court rulings, Mr. Kalanick, on May 20, 2016, moved to join Uber as a defendant in this case, see Notice of Motion for Joinder, Dkt. 46, and that motion was granted. See Memorandum Order dated June 19, 2016, Dkt. 90.

**\*2** Uber had also moved to intervene, see Notice of Motion to Intervene, Dkt. 58, and, once Mr. Kalanick's motion to join Uber was granted, Uber's motion to intervene was denied as moot. See Memorandum Order dated June 19, 2016. But attached to Uber's motion to intervene was a motion to compel arbitration. See Proposed Intervenor Uber Technologies, Inc.'s Memorandum of Law in Support of Motion to Compel Arbitration, Dkt. 59–2. Uber argued that Mr. Meyer was required to arbitrate his claims pursuant to a contract formed when he signed up to use Uber. See id. at 1. On June 7, 2016, defendant Kalanick also moved to compel arbitration. See Memorandum of Law in Support of Defendant Travis Kalanick's Motion to Compel Arbitration ("Kalanick Br."), Dkt. 81. Mr. Kalanick claimed that even though he was not a signatory to the contract that plaintiff had formed with Uber, he could enforce the arbitration provision of that contract against plaintiff. See id. at 1. After Uber was joined as a defendant, it re-filed its motion to compel arbitration. See Uber Technologies, Inc.'s Memorandum of Law in Support of Motion to Compel Arbitration ("Uber Br."), Dkt. 92.

As the motions to compel arbitration were then ripe, the Court ordered full briefing. By papers filed on June 29, 2016, plaintiff opposed the motions to compel arbitration filed by defendants Kalanick and Uber. See Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration ("Pl. Opp. Br."), Dkt. 102. On July 7, 2016, Mr. Kalanick and Uber filed separate replies to plaintiff's opposition. See Reply Memorandum of Law in Support of Defendant Travis Kalanick's Motion to Compel Arbitration ("Kalanick Reply Br."), Dkt. 110; Uber Technologies, Inc.'s Reply in Support of Motion to Compel Arbitration ("Uber Reply Br."), Dkt. 113. Thereafter, on July 14, 2016, the Court held oral argument. See Transcript dated July 14, 2016 ("Tr."), Dkt. 124.

Having now carefully considered all these submissions and arguments, the Court hereby denies the motions to compel arbitration filed by Uber and by Mr. Kalanick. It should be noted at the outset that the parties' submissions raise a number of important but subsidiary questions, such as, for example, whether Mr. Kalanick is permitted to enforce an alleged arbitration agreement to which he is not a signatory and whether Mr. Kalanick and/or Uber have waived any right to compel arbitration through their prior statements and participation in litigation in this Court. At this juncture, however, the Court need not decide these questions, since it finds that the motions are resolved by the threshold question of whether plaintiff actually formed any agreement to arbitrate with Uber, let alone with Mr. Kalanick.

[2]Plaintiff denies that such an agreement was ever formed, on the ground that when he registered to use Uber, he did not have adequate notice of the existence of an arbitration agreement. See Pl. Opp. Br. at 10-14. The question of whether an arbitration agreement existed is for the Court and not an arbitrator to decide, as Uber acknowledged at oral argument. See Tr. 75:2-10; see also Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 392 (2d Cir.2011); Celltrace Communs. Ltd. v. Acacia Research Corp., 2016 WL 3407848, \*2–3, 2016 U.S. Dist. LEXIS 78620, \*5–6 (S.D.N.Y. June 16, 2016).

[3]The parties argue, however, over which state's law should be applied to the issue of whether plaintiff agreed to arbitrate his claims. The Court previously indicated that California law would apply to the User Agreement between Uber and its riders—i.e., the agreement that contains the arbitration clause and to which plaintiff is alleged to have assented.[1] See Opinion dated May 7, 2016, at 5-6. Plaintiff supports the application of California law, see Pl. Opp. Br. at 25-27, and in fact, defendant Kalanick expressly stated in previous briefing in this case that California law applied. See Defendant's Memorandum of Law in Support of Defendant Travis

Kalanick's Motion to Dismiss, Dkt. 28, at 23 ("In this case, the relevant contract law is the law of California."); see also Memorandum of Law in Support of Defendant Travis Kalanick's Motion for Reconsideration of the Court's Holding Regarding Plaintiff's Class Action Waiver, Dkt. 41, at 7 n.3 ("Given the facts pled in the Complaint, California law would appear to apply given Uber's connections to California; the only other alternative is New York."). Yet Mr. Kalanick and Uber now contend that New York law should apply to the User Agreement, citing "evidence now available" concerning Uber rides that plaintiff Meyer has taken. See Kalanick Br. at 15-17; Uber Br. at 12-13.

**\*3** [4]Although the Court does not view the choice between California law and New York law as dispositive with respect to the issue of whether an arbitration agreement was formed, the Court confirms its prior decision to apply California law to the User Agreement. To reach this result, the Court first employed (and again employs) New York's "interest analysis" for deciding which state law to apply in these circumstances. According to that analysis, a court "must consider five factors: (1) the place of contracting; (2) the place of the contract negotiations; (3) the place of the performance of the contract; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, places of incorporation, and places of business of the parties." Philips Credit Corp. v. Regent Health Grp., Inc., 953 F.Supp. 482, 502 (S.D.N.Y.1997).

Here, the fact that Uber—one of the parties to the alleged contract, and the contract's drafter—is located in California weighs heavily in favor of the application of California law. Consistent with this finding is the fact that although Uber's May 17, 2013 User Agreement (the one to which plaintiff is alleged to have assented) contains no explicit choice-of-law clause, that agreement indicates that the arbitrator referenced in the agreement's arbitration provision "will be either a retired judge or an attorney licensed to practice law in the state of California," see User Agreement, Dkt. 29–1, at 8. Moreover, later versions of the User Agreement contain an explicit California choice-of-law clause. See Declaration of Jeffrey A. Wadsworth ("Wadsworth Decl."), Exhibit 1, Dkt. 101–1, at UBER-00000221; Wadsworth Decl., Exhibit 2, Dkt. 101–2, at UBER-00000233.

The other interest analysis factors do not favor any other state's law more strongly than that of California. According to the uncontested representation of Uber's Senior Software Engineer Vincent Mi, the plaintiff has taken three Uber rides in New York City; one in

Connecticut; three in Washington, D.C.; and three in Paris. See Uber Br., Exhibit 1, Dkt. 92–1 ("Mi Decl."), ¶ 4. Plaintiff Meyer lives in Connecticut, see First Amended Complaint, Dkt. 26, ¶ 7, and he recalls living in Vermont when he registered to use Uber. See Declaration of Spencer Meyer ("Meyer Decl."), Dkt. 100, ¶ 2. None of these features of the case, or any others, supports the choice of New York law over California law. Accordingly, the Court reaffirms its prior holding that California law applies to the User Agreement.[2]

[5]Turning, then, to the question of whether plaintiff agreed to arbitrate his claims, defendants first argue that plaintiff conceded that he had so agreed through a statement made in his Amended Complaint. See Kalanick Br. at 7; Uber Br. at 8. Specifically, plaintiff stated in his Amended Complaint that "[t]o become an Uber account holder, an individual first must agree to Uber's terms and conditions and privacy policy." Amended Complaint, ¶ 29. But defendants read this statement out of context, as the statement does not specifically reference the plaintiff. And plaintiff's counsel clarified at oral argument that the statement was not intended as some kind of implicit waiver, and that, if required, he could amend the complaint to so clarify. See Tr. 92:1-25. The Federal Rules of Civil Procedure provide that "[t]he court should freely give leave [to amend a pleading] when justice so requires," Fed. R. Civ. P. 15(a)(2), and so, for instant purposes, the Court will deem the complaint so amended. Moreover, even without the amendment, the Court does not construe this one instance of the complaint as somehow a knowing and voluntary waiver of the right to argue that Mr. Meyer was never adequately notified of the alleged agreement to arbitrate.[3]

**\*4** The Court therefore turns to the heart of plaintiff's argument that he did not agree to arbitrate his claims. As previously indicated, guidance from the Court of Appeals was provided in Specht v. Netscape Commc'ns Corp., 306 F.3d 17 (2d Cir.2002), and that decision is particularly apt because it applied California law. Applying that law, the Specht court found that certain plaintiffs had not assented to a license agreement containing a mandatory arbitration clause because adequate notice and assent were not present on the facts of that case. See id. at 24, 32, 35.

In the instant case, the essentially undisputed facts relevant to the issue of whether plaintiff assented to the arbitration agreement are as follows. According to a declaration submitted by Uber engineer Mi, plaintiff Meyer registered for Uber on October 18, 2014 via the Uber smartphone application (the "Uber app") using a Samsung Galaxy S5 phone with an Android operating

system. See Mi Decl. ¶ 3. At the time that Mr. Meyer registered to use Uber, Uber rider registration using a smartphone involved a two-step process. See Mi Decl., ¶ 5; Uber Br. at 14. At the first screen, potential Uber riders were prompted either to register using Google+ or Facebook, or to enter their name, email address, phone number, and password and click "Next." See Mi Decl., Exhibit A, Dkt. 92-2, at 001. Potential riders who clicked "Next" at the first screen were directed to a second screen, where they could make payment and register to use Uber. See Mi Decl., Exhibit A, at 002. Uber has provided an image of this second screen—the crucial one for the purposes of determining plaintiff's assent to the arbitration agreement—that is considerably larger than the screen that would be faced by the user of a Samsung Galaxy S5 phone. Therefore, the Court attaches to this opinion an image of the second screen scaled down to reflect the size of such a phone (with a 5.1″ or 129.4 mm display size).[4]

The second screen of the Uber registration process features, at the top of the screen, fields for users to insert their credit card details. See Mi Decl., Exhibit A, at 002. Beneath these fields is a large, prominent button whose width spans most of the screen; it is labeled "Register." See id. Beneath this button are two additional buttons, with heights similar to that of the "Register" button, labeled "PayPal" and "Google Wallet." See id. These buttons indicate that a user may make payments using PayPal or Google Wallet instead of entering his or her credit card information. See id.; Uber Br. at 4; Pl. Opp. Br. at 3.

Beneath these two additional buttons, in considerably smaller font, are the words "By creating an Uber account, you agree to the Terms of Service & Privacy Policy." See Mi Decl., Exhibit A, at 002. While the phrase "Terms of Service & Privacy Policy" is in all-caps, the key words "By creating an Uber account, you agree to" are not in any way highlighted and, indeed, are barely legible.[5]

Although the fact that the phrase "Terms of Service & Privacy Policy" is underlined and in blue suggests that the phrase is a hyperlink, see Uber Br. at 4; Mi Decl. ¶ 5(b), a potential user may click on the "Register" button and complete the Uber registration process without clicking on this hyperlink. See Pl. Opp. Br. at 12. Even if a potential user does click on the hyperlink, she is not immediately taken to the actual terms and conditions. Rather, in the words of Uber engineer Mi, "the user is taken to a screen that contains a button that accesses the 'Terms and Conditions' and 'Privacy Policy' then in effect." Mi Decl. ¶ 5(b); see also Uber Br. at 5.[6] Thus, it is only by clicking first the hyperlink and then the

button—neither of which is remotely required to register with Uber and begin accessing its services—that a user can even access the Terms and Conditions.

*5 Further still, even if a user were to arrive at the Terms and Conditions, these terms (which the Court calls the "User Agreement") consist of nine pages of highly legalistic language that no ordinary consumer could be expected to understand. And it is only on the very bottom of the seventh page that one finally reaches the following provision:

**Dispute Resolution**

You and Company agree that any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof or the use of the Service or Application (collectively, "**Disputes**") will be settled by binding arbitration, except that each party retains the right to bring an individual action in small claims court and the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights. **You acknowledge and agree that you and Company are each waiving the right to a trial by jury or to participate as a plaintiff or class User in any purported class action or representative proceeding.** Further, unless both you and Company otherwise agree in writing, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of any class or representative proceeding. If this specific paragraph is held unenforceable, then the entirety of this "Dispute Resolution" section will be deemed void. Except as provided in the preceding sentence, this "Dispute Resolution" section will survive any termination of this Agreement.

User Agreement at 7-8 (boldface in the original). The bolded sentence in the middle of this paragraph is the only bolded sentence in the User Agreement that is not part of a header, although other statements in the User Agreement are in all-caps. See, e.g., id. at 6 ("Limitation of Liability").

[6]Plaintiff Meyer states that he does not recall noticing the Terms of Service hyperlink when he registered to use Uber and does not believe that he clicked on the hyperlink. See Meyer Decl., ¶ 3. Uber does not contest this statement, and the Court finds no basis for a claim that plaintiff Meyer had "actual knowledge of the agreement." Nguyen v. Barnes & Noble Inc., 763 F.3d

Meyer v. Kalanick, --- F.Supp.3d ---- (2016)

2016 WL 4073012, 2016-2 Trade Cases P 79,721

1171, 1177 (9th Cir.2014) (applying New York law). However, an individual may still be said to have assented to an electronic agreement if "a reasonably prudent user" would have been put "on inquiry notice of the terms of the contract." Barnes & Noble, 763 F.3d at 1177; see also Schnabel v. Trilegiant Corp., 697 F.3d 110, 120 (2d Cir.2012); Specht, 306 F.3d at 20.[7]

Courts addressing electronic contract formation have at times distinguished between two types of agreements: " 'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." Barnes & Noble, 763 F.3d at 1175–76. "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." Be In, Inc. v. Google Inc., No. 12–cv–03373, 2013 WL 5568706, at *6 (N.D.Cal. Oct. 9, 2013); see also Long v. Provide Commerce, Inc., 245 Cal.App.4th 855, 200 Cal.Rptr.3d 117, 123 (2016) (internal quotation marks omitted).

*6 [7]"Clickwrap" agreements are more readily enforceable, since they "permit courts to infer that the user was at least on inquiry notice of the terms of the agreement, and has outwardly manifested consent by clicking a box." Cullinane, 2016 WL 3751652, at *6; see also Specht, 306 F.3d at 22 n. 4; Savetsky v. Pre–Paid Legal Servs., Inc., 14–cv–03514, 2015 WL 604767, at *3 (N.D.Cal. Feb. 12, 2015); Berkson v. Gogo LLC, 97 F.Supp.3d 359, 397 (E.D.N.Y.2015); United States v. Drew, 259 F.R.D. 449, 462 n. 22 (C.D.Cal.2009). "Browsewrap agreements are treated differently under the law than 'clickwrap' agreements." Schnabel, 697 F.3d at 129 n. 18. Courts will generally enforce browsewrap agreements only if they have ascertained that a user " 'had actual or constructive knowledge of the site's terms and conditions, and ... manifested assent to them.' " Id. (quoting Cvent, Inc. v. Eventbrite, Inc., 739 F.Supp.2d 927, 937 (E.D.Va.2010)). This is rarely the case for individual consumers. In fact, courts have stated that "the cases in which courts have enforced browsewrap agreements have involved users who are businesses rather than, as in Specht ... consumers." Fteja v. Facebook, Inc., 841 F.Supp.2d 829, 836 (S.D.N.Y.2012); see also Berkson, 97 F.Supp.3d at 396 ("Following the ruling in Specht, courts generally have enforced browsewrap agreements only against knowledgeable accessors, such as corporations, not against individuals."); Mark A. Lemley, Terms of Use, 91 Minn. L. Rev. 459, 472 (2006) ("An

examination of the cases that have considered browsewraps in the last five years demonstrates that the courts have been willing to enforce terms of use against corporations, but have not been willing to do so against individuals.").

Here, the User Agreement to which plaintiff Meyer allegedly assented was clearly not a clickwrap agreement. Mr. Meyer did not need to affirmatively click any box saying that he agreed to Uber's "Terms of Service." On the contrary, he could sign up for Uber by clicking on the "Register" button without explicitly indicating his assent to the terms and conditions that included the arbitration provision. See Mi Decl., Exhibit A, at 002. As with a browsewrap agreement, an Uber user could access Uber's services "without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." Be In, 2013 WL 5568706, at *6.

Nevertheless, Uber's User Agreement differs from certain browsewrap agreements in which "by visiting the website—something that the user has already done—the user agrees to the Terms of Use not listed on the site itself but available only by clicking a hyperlink." Barnes & Noble, 763 F.3d at 1176 (internal quotation marks omitted); see also Fteja, 841 F.Supp.2d at 838 ("Facebook's Terms of Use are somewhat like a browsewrap agreement in that the terms are only visible via a hyperlink, but also somewhat like a clickwrap agreement in that the user must do something else—click 'Sign Up'—to assent to the hyperlinked terms."). Uber's User Agreement might be characterized as a "sign-in wrap," since a user is allegedly "notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process." Berkson, 97 F.Supp.3d at 399; see also Cullinane, 2016 WL 3751652, at *6. Sign-in wraps have been described as "[a] questionable form of internet contracting." Berkson, 97 F.Supp.3d at 399. Here, as indicated, the notification was in a font that was barely legible on the smartphone device that a would—be Uber registrant could be expected to use.

[8] [9]Of course, all these labels can take courts only so far. The issue of whether plaintiff Meyer agreed to arbitrate his claims "turns more on customary and established principles of contract law than on newly-minted terms of classification." Cullinane, 2016 WL 3751652, at *6. For while the Internet may have reduced ever further a consumer's power to negotiate terms, "it has not fundamentally changed the principles of contract." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir.2004). One of these principles is that "[m]utual manifestation of assent ... is the touchstone of contract."

Specht, 306 F.3d at 29. Moreover, "[a]rbitration agreements are no exception to the requirement of manifestation of assent," id. at 30, and "[c]larity and conspicuousness of arbitration terms are important in securing informed assent." Id. The Specht standard provides a way for courts to ascertain whether this fundamental principle of contract law has been vindicated, and it is this standard—whether plaintiff Meyer had "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms"—that the Court will apply. Id. at 35.

*7 While every case is different, the Court has examined the decisions of other courts that have considered issues of electronic contract formation, even where, as in many cases, these decisions are not binding on this Court. In numerous cases in which electronic contracts were held to have been properly formed, notice of the existence of those contracts was more conspicuous—in some cases, much more conspicuous—than in the instant case, and indications of assent were much more express. For example, in Mohamed v. Uber Technologies, Inc., a case cited by Uber, see Uber Reply Br. at 2 n.2, a court in the Northern District of California concluded that a binding contract had been formed between Uber drivers and Uber. See Mohamed v. Uber Techs., Inc., 109 F.Supp.3d 1185, 1197 (N.D.Cal.2015). There, Uber drivers could not access the Uber app without clicking a button marked "Yes, I agree" beneath the phrase "By clicking below, you acknowledge that you agree to all the contracts above," with those contracts hyperlinked above, and then clicking "Yes, I agree" on a screen containing text stating "Please confirm that you have reviewed all the documents and agree to all the new contracts." Id. at 1190–91. In the instant case, by contrast, plaintiff Meyer did not have to click any button explicitly indicating assent to Uber's User Agreement, and the hyperlink to Uber's "Terms of Service" was nowhere near as prominent as in Mohamed.

In Cullinane v. Uber Techs., Inc., on which Uber also relies, a court held that Uber users had formed an agreement to arbitrate their claims. See Cullinane, 2016 WL 3751652, at *7. There, the applicable version of Uber's registration screen for users, like in the instant case and unlike in Mohamed, did not require users to affirmatively click "I agree." See id. (Dkts. 32-2, 32-3). However, in the user interface that some of the Cullinane plaintiffs faced, the clickable box with the phrase "Terms of Service & Privacy Policy" was clearly delineated, and the words appeared in bold white lettering on a black background, in a size similar to, if not larger than, the size of the "Done" button that users clicked in order to register. See Cullinane, 2016 WL 3751652 (Dkts. 32-3,

32–5). In the instant case, by contrast, the phrase "Terms of Service & Privacy Policy" is much smaller and more obscure, both in absolute terms and relative to the "Register" button.[8]

A review of numerous other cases finding that an electronic agreement was formed highlights the point that the Uber registration process in plaintiff Meyer's case involved a considerably more obscure presentation of the relevant contractual terms.[9] Further, by contrast to the situation in Register.com, 356 F.3d 393 at 401–02, there is no evidence that plaintiff Meyer repeatedly visited Uber's registration screen.[10]

*8 Rather, Uber's interface here shares certain characteristics in common with instances in which courts have declined to hold that an electronic agreement was formed. Most obviously, Uber riders need not click on any box stating "I agree" in order to proceed to use the Uber app—a feature that courts have repeatedly made note of in declining to find that an electronic contract was formed. See, e.g., Barnes & Noble, 763 F.3d at 1176; Specht, 306 F.3d at 22–23; Savetsky v. Pre-Paid Legal Servs., Inc., 14–cv–03514, 2015 WL 604767, at *4 (N.D.Cal. Feb. 12, 2015). Nor do the license terms in the instant case appear on the screen in view of the user. See Motise v. Am. Online, Inc., 346 F.Supp.2d 563, 565 (S.D.N.Y.2004). As the Seventh Circuit has stated, a court "cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)." Sgouros v. TransUnion Corp., 817 F.3d 1029, 1035 (7th Cir.2016).

Significantly for the purposes of determining whether plaintiff was on inquiry notice, the hyperlink here to the "Terms of Service & Privacy Policy" is by no means prominently displayed on Uber's registration screen. While the payment information and "Register" button are "very user-friendly and obvious," Berkson, 97 F.Supp.3d at 404, Uber's statement about "Terms of Service" appears far below and in much smaller font. As a result, "the design and content of" Uber's registration screen did not "make the 'terms of use' (i.e., the contract details) readily and obviously available to the user." Id. at 402; see also Long, 200 Cal.Rptr.3d at 126 (recognizing "the practical reality that the checkout flow is laid out in such a manner that it tended to conceal the fact that placing an order was an express acceptance of [defendant's] rules and regulations.") (internal quotation marks and alterations omitted).

Indeed, the Terms of Service hyperlink in the instant case is less conspicuous than the one found not to give rise to

Meyer v. Kalanick, --- F.Supp.3d ---- (2016)

2016 WL 4073012, 2016-2 Trade Cases P 79,721

an electronically-formed contract in Berkson. In that case, the statement "By clicking 'Sign In' I agree to the terms of use and privacy policy" appeared above the most prominent "Sign In" button on the web page. See Berkson, 97 F.Supp.3d at 373–74, 403–04. This statement, while plausibly providing inadequate notice, was actually more likely to disrupt viewers' experiences in some way and draw their attention to the terms and conditions than the interface in the instant case, where the hyperlink stating "Terms of Service & Privacy Policy" is located far beneath the "Register" button and takes on the appearance of an afterthought. See Mi Decl., Exhibit A, at 002. Moreover, unlike in Berkson, the registration screen here does not contain parallel wording as between the "Register" button and the statement "By creating an Uber account, you agree to the Terms of Service & Privacy Policy." See Berkson, 97 F.Supp.3d at 373–74; see also Fteja, 841 F.Supp.2d 835 (Dkt. 12 at 17). The relative obscurity of the reference to "Terms of Service" in the Uber interface is significant; courts have declined to hold that a valid electronic contract was formed when "the website did not prompt [a party] to review the Terms and Conditions and because the link to the Terms and Conditions was not prominently displayed so as to provide reasonable notice of the Terms and Conditions." Hines v. Overstock.com, Inc., 668 F.Supp.2d 362, 367 (E.D.N.Y.2009), aff'd, 380 Fed.Appx. 22 (2d Cir.2010).

[10]As this brief review suggests, electronic agreements fall along a spectrum in the degree to which they provide notice, and it is difficult to draw bright-line rules because each user interface differs from others in distinctive ways. Consequently, courts must embark on a "fact-intensive inquiry," Sgouros, 817 F.3d at 1034–35, in order to make determinations about the existence of "[r]easonably conspicuous notice" in any given case. Specht, 306 F.3d at 35.

*9 Here, the Court finds that plaintiff Meyer did not have "[r]easonably conspicuous notice" of Uber's User Agreement, including its arbitration clause, or evince "unambiguous manifestation of assent to those terms." Id. Most importantly, the Uber registration screen, as explained supra, did not adequately call users' attention to the existence of Terms of Service, let alone to the fact that, by registering to use Uber, a user was agreeing to them. Like in Long, the "Terms of [Service] hyperlink[ ]—[its] placement, color, size and other qualities relative to the [Uber app registration screen's] overall design—[is] simply too inconspicuous to meet [the Specht] standard." Long, 200 Cal.Rptr.3d at 125–26. When to this is coupled the fact that the key words "By creating an Uber account, you agree to" are even more inconspicuous, it is hard to escape the inference that the

creators of Uber's registration screen hoped that the eye would be drawn seamlessly to the credit card information and register buttons instead of being distracted by the formalities in the language below. And this, the Court finds, is the reasonably foreseeable result.

Further still, the wording of Uber's hyperlink adds to the relative obscurity of Uber's User Agreement. The Court cannot simply assume that the reasonable (non-lawyer) smartphone user is aware of the likely contents of "Terms of Service," especially when that phrase is placed directly alongside "Privacy Policy." There is, after all, a "breadth of the range of technological savvy of online purchasers" (and smartphone users). Barnes & Noble, 763 F.3d at 1179; see also Long, 200 Cal.Rptr.3d at 127; Berkson, 97 F.Supp.3d at 400. The reasonable user might be forgiven for assuming that "Terms of Service" refers to a description of the types of services that Uber intends to provide, not to the user's waiver of his constitutional right to a jury trial or his right to pursue legal redress in court should Uber violate the law.[11] In other words, "the importance of the details of the contract" was "obscured or minimized by the physical manifestation of assent expected of a consumer seeking to purchase or subscribe to a service or product." Berkson, 97 F.Supp.3d at 402. There is a real risk here that Uber's registration screen "made joining [Uber] fast and simple and made it appear—falsely—that being a [user] imposed virtually no burdens on the consumer besides payment." Schnabel, 697 F.3d at 127–28.

Additionally, the hurdles for Uber users were not at an end even if they did click on the initial hyperlink. Such users were "taken to a screen that contains a button that accesses the 'Terms and Conditions' and 'Privacy Policy' then in effect." Mi Decl., ¶ 5(b). Once users reached the "Terms of Service" (i.e., the User Agreement), they had to scroll down several pages in order to come across the arbitration provision, located in a "dispute resolution" section. See Sgouros, 817 F.3d at 1033; Savetsky, 2015 WL 604767, at *4. While the "dispute resolution" heading in the User Agreement is bolded, as is the waiver (in the arbitration context) of the right to a jury trial or class proceeding, users would have had to reach this part of the agreement to discover the bolded text at all (unlike, for example, the prominent warning about the existence of an arbitration clause in Guadagno v. E*Trade Bank, 592 F.Supp.2d 1263, 1271 (C.D.Cal.2008)). Though "[a] party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing," Specht, 306 F.3d at 30 (internal quotation marks omitted), the placement of the arbitration clause in Uber's User Agreement constituted, as a practical matter, a further barrier to reasonable notice.

Meyer v. Kalanick, --- F.Supp.3d ---- (2016)

2016 WL 4073012, 2016-2 Trade Cases P 79,721

**\*10** At bottom, what is at stake is the "integrity and credibility" of "electronic bargaining." Specht, 306 F.3d at 35. When contractual terms as significant as the relinquishment of one's right to a jury trial or even of the right to sue in court are accessible only via a small and distant hyperlink titled "Terms of Service & Privacy Policy," with text about agreement thereto presented even more obscurely, there is a genuine risk that a fundamental principle of contract formation will be left in the dust: the requirement for "a manifestation of mutual assent." Schnabel, 697 F.3d at 119 (internal quotation marks omitted). One might be tempted to argue that the nature of electronic contracts is such that consumers do not read them, however conspicuous these contracts are, and that consumers have resigned themselves simply to clicking away their rights. But that would be too cynical and hasty a view, and certainly not the law. The purveyors of electronic form contracts are legally required to take steps to provide consumers with "reasonable notice" of contractual terms. See Specht, 306 F.3d at 20. User interfaces designed to encourage users to overlook contractual terms in the process of gaining access to a product or service are hardly a suitable way to fulfill this legal mandate.

[11]"[T]he Federal Arbitration Act ... does not require parties to arbitrate when they have not agreed to do so." Schnabel, 697 F.3d at 118 (internal quotation marks omitted). The Court finds that, in light of all the relevant facts and circumstances, plaintiff Meyer did not form such an agreement here. Consequently, defendant Uber may not enforce the arbitration clause against Mr. Meyer. As a result, even if defendant Kalanick were entitled to enforce this arbitration clause and had not waived such a right—issues that the Court does not now decide—he too would be unable to enforce the arbitration clause. The Court hence denies the motions to compel arbitration filed by both Mr. Kalanick and Uber.

The Clerk of Court is directed to close docket entries 80 and 91.

SO ORDERED.

Attachment



**All Citations**

--- F.Supp.3d ----, 2016 WL 4073012, 2016-2 Trade Cases P 79,721

Footnotes

1    Defendants Kalanick and Uber refer to this agreement as Uber's "Rider Terms." The Court refers to the agreement as the "User Agreement" for the sake of consistency with the Court's previous rulings, but no substantive point depends on this terminological choice.

2    Nevertheless, as indicated above, the Court does not see the choice between California law and New York law as dispositive with regard to the issue of whether plaintiff formed an agreement to arbitrate. Even if the Court were to

apply New York law, it would hold that plaintiff had not formed such an agreement.

3    The same is even more true of a passing remark plaintiff's counsel made at oral argument in one of the hearings before the Court on another issue. See Transcript dated June 16, 2016, Dkt. 94, at 15:14-15.

4    See    Tech    Specs,    Samsung    Galaxy    S5, http://www.samsung.com/uk/consumer/mobile-devices/smartphones/galaxys/SM-G900FZKABTU.

5    In the Court's reckoning, the word "Register" is in approximately 10-point font, the phrase "Terms of Service & Privacy Policy" is in approximately 6-point font, and the words "By creating an Uber account, you agree to" may be in even smaller font and certainly no greater than 6-point font.

6    In fact, unlike a declaration that Uber submitted in another recent case, Mr. Mi's declaration does not attest that "[t]he Terms & Conditions then in effect would be displayed when the 'Terms & Conditions' button was clicked." Declaration of Paul Holden, Cullinane v. Uber Techs., Inc., No. 14–cv–14750, 2016 WL 3751652 (D.Mass. July 11, 2016) (Dkt. 32–1); see also Resorb Networks, Inc. v. YouNow.com, 30 N.Y.S.3d 506, 51 Misc.3d 975 (N.Y.Sup.Ct.2016). (Docket numbers in parentheticals refer to docket entries in other cases, usually containing screenshots of websites or other interfaces referenced in other court decisions.)

7    Much of the case law on electronic bargaining relates to the context of Internet transactions, while the alleged agreement in the instant case was formed via mobile application. However, the Court sees little reason to distinguish between the two contexts, and neither does existing case law. See, e.g., Cullinane, 2016 WL 3751652, at *6.

8    In fact, in the user interface that other Cullinane plaintiffs faced, the phrase "Terms of Use & Privacy Policy" was placed between the field in which the user's credit card number would appear and the numbers that users would tap in order to enter their credit card information—a clearly prominent location. See Cullinane, 2016 WL 3751652 (Dkts. 32–2, 32–4).

9    See, e.g., Defillipis v. Dell Fin. Servs., 14–cv–115, 2016 WL 394003, at *3 (M.D.Pa. Jan. 29, 2016) ("an applicant had to affirmatively click a box agreeing: 'I have read and agree to the Privacy Policy and Terms & Conditions, which contain important account information.' "); Bassett v. Elec. Arts, Inc., 93 F.Supp.3d 95, 99 (E.D.N.Y.2015) ( "Plaintiff would have been presented with four buttons, two of which are the links to the terms of service and privacy policy, one which reads 'I Do Not Accept,' and one which reads 'I Have Read And Accept Both Documents.' ... If the registrant ... does not click the button reading "I ... Accept the registration process stops and the online features cannot be activated."); Nicosia v. Amazon.com, Inc., 84 F.Supp.3d 142, 150 (E.D.N.Y.2015) (Dkt. 53–3) (the statement "By placing your order, you agree to Amazon.com's privacy notice and conditions of use" appears directly under "Review your order" and higher on the page than the button to click to "Place your order," so that "[t]o place his orders, Plaintiff had to navigate past this screen by clicking a square icon below and to the right of this disclaimer, which states: 'Place your order.' "); Whitt v. Prosper Funding, LLC, 15–cv–136, 2015 WL 4254062, at *1 (S.D.N.Y. July 14, 2015) (Dkt. 41–1) ("An applicant could not complete a loan application without clicking the box indicating his or her acceptance of the Agreement."); Tompkins v. 23andMe, Inc., 13–cv–05682, 2014 WL 2903752, at *3 (N.D.Cal. June 25, 2014) ("The account creation page requires customers to check a box next to the line, 'Yes, I have read and agree to the Terms of Service and Privacy Statement' ... Similarly, during the registration process, ... [c]ustomers must then click a large blue icon that reads 'I ACCEPT THE TERMS OF SERVICE' before finishing the registration process"); Swift v. Zynga Game Network, Inc., 805 F.Supp.2d 904, 911 (N.D.Cal.2011) ("Plaintiff admits that she was required to and did click on an 'Accept' button directly above a statement that clicking on the button served as assent to the YoVille terms of service along with a blue hyperlink directly to the terms of service."); Zaltz v. JDATE, 952 F.Supp.2d 439, 453–54 (E.D.N.Y.2013) ("defendant's reference to its Terms and Conditions of Service appear above the button" that "a prospective user had to click in order to assent"); 5831 Partners LLC v. Shareasale.com, 12–cv–4263, 2013 WL 5328324, at *7 & n. 4 (E.D.N.Y. Sept 23, 2013) ("defendant's reference to its Merchant Agreement appears adjacent to the activation button ... in determining that the forum selection clause was reasonably communicated to plaintiff, [the Court] is solely relying on the second page of the sign up process (in which a prospective merchant must click to activate its account and is informed that 'By clicking and making a request to Activate, you agree to the terms and conditions in the Merchant Agreement.' "); Vernon v. Qwest Commc'ns Int'l, Inc., 925 F.Supp.2d 1185, 1191 (D.Colo.2013) ("At each stage of the enrollment process the consumer was referred to the Subscriber Agreement and, in some instances, specifically to the existence of an arbitration clause."); Ft eja, 841 F.Supp.2d 835 (Dkt. 12 at 17) (the phrase "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Policy" appeared directly below the button marked "Sign Up," and, this Court finds, the symmetry between the "Sign Up" process would help to catch the reader's eye); Guadagno v. E*Trade Bank, 592 F.Supp.2d 1263, 1267, 1271 (C.D.Cal.2008) (Dkt. 31–2) (users had to check a box acknowledging that they had reviewed the Account Agreement); Feldman v. Google, Inc., 513 F.Supp.2d 229, 233, 237 (E.D.Pa.2007) (Dkt. 16–27 (in order to activate their accounts, users had to click a

Meyer v. Kalanick, --- F.Supp.3d ---- (2016)

2016 WL 4073012, 2016-2 Trade Cases P 79,721

box stating "**Yes**, I agree to the above terms and conditions" displayed in a scrollable text box); Major v. McCallister, 302 S.W.3d 227 (Mo.Ct.App.2009) (the party seeking to enforce the contract "did put 'immediately visible notice of the existence of license terms'—i.e., 'By submitting you agree to the Terms of Use' and a blue hyperlink—right next to the button that Appellant pushed.").

10      In Register.com, the Second Circuit drew an analogy between an electronic contract and an apple stand with a sign, visible only as one turns to exit, naming the price of apples. The Second Circuit indicated that an individual who eats an apple without paying might avoid contractual liability the first time he did so, but he would not be able to do so if he thereafter visited the stand and ate apples several times a day. See Register.com, 356 F.3d at 401–02. Other courts have since extended the Register.com analogy in different directions, see Fteja, 841 F.Supp.2d at 839; Cullinane, 2016 WL 3751652, at *7, but Register.com itself focuses on the repetition of the activity of seeing the sign.

11      It may be noted, a propos the expectations of the ordinary consumer, that according to a 2015 study carried out by the Consumer Financial Protection Bureau, "[o]ver three quarters of those who said they understood what arbitration is acknowledged they did not know whether their credit card agreement contained an arbitration clause. Of those who thought they did know, more than half were incorrect about whether their agreement actually contained an arbitration clause. Among consumers whose contract included an arbitration clause, fewer than 7 percent recognized that they could not sue their credit card issuer in court." See Consumer Financial Protection Bureau Study Finds That Arbitration Agreements Limit Relief for Consumers, Consumer Protection Financial Bureau, March 10, 2015, http://www.consumerfinance.gov/about-us/newsroom/cfpb-study-findsthat-arbitration-agreements-limit-relief-for-consu mers.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.